UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

MUTINTA MICHELO, KATHERINE SEAMAN, )
MARY RE SEAMAN, and SANDRA TABAR, )
individually and on behalf of all others similarly situated, )
)
                                 Plaintiffs, )
)
        v. )
)
NATIONAL COLLEGIATE STUDENT LOAN )     No. 18-cv-1781
TRUST 2007-2; NATIONAL COLLEGIATE )
STUDENT LOAN TRUST 2007-3; )
TRANSWORLD SYSTEMS, INC., in its own right and )
as successor to NCO FINANCIAL SYSTEMS, INC.; )
EGS FINANCIAL CARE INC., formerly known as )
NCO FINANCIAL SYSTEMS, INC.; and )
FORSTER & GARBUS LLP, )
)
                          Defendants. )
_____ )

CHRISTINA BIFULCO, FRANCIS BUTRY, )
and CORI FRAUENHOFER, individually and on )
behalf of all others similarly situated, )
)
                                 Plaintiffs, )
)
        v. )
)
NATIONAL COLLEGIATE STUDENT LOAN )     No. 18-cv-7692
TRUST 2004-2; NATIONAL COLLEGIATE )
STUDENT LOAN TRUST 2006-4; )
TRANSWORLD SYSTEMS, INC., in its own right and )
as successor to NCO FINANCIAL SYSTEMS, INC.; )
EGS FINANCIAL CARE INC., formerly known as )
NCO FINANCIAL SYSTEMS, INC.; and )
FORSTER & GARBUS LLP, )     **FILED VIA ECF**
)
                          Defendants. )
_____ )

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I. COMMON FACTS ............................................................................................ 2

    A.  Defendants' Business Model: Complex Assignments And Securitizations................... 2

    B.  Defendants' Employees Generate Deceptive Court Filings............................................. 4

    C.  Defendants Used Fraudulent Collection Suits And Affidavits ....................................... 6

    D.  The Discovery Granted To Plaintiffs For Class Certification........................................ 7

II. STANDARD OF REVIEW ............................................................................... 8

III. CLASS DEFINITIONS ................................................................................. 10

IV. ARGUMENT .................................................................................................. 11

    A.  The Class Satisfies Rule 23(a)................................................................................... 11

    B.  A Rule 23(b)(3) Class Should Be Certified................................................................. 17

    C.  A Separate Rule 23(b)(2) Class Also Should Be Certified ......................................... 23

    D.  In The Alternative, This Court May Define And Certify A Liability Class.............. 25

    E.  Named Plaintiffs' Counsel Should Be Appointed Class Counsel ............................. 25

V. CONCLUSION................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)........................................................................................... 8

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    568 U.S. 455 (2013)........................................................................................... 9

*Burley v. City of N.Y.,*
    No. 03 Civ. 735, 2005 U.S. Dist. LEXIS 4439 (S.D.N.Y. Mar. 23, 2005) ............................. 13

*Bynum v. Dist. of Columbia,*
    214 F.R.D. 27 (D.D.C. 2003)........................................................................ 19

*Chery v. Conduent Educ. Servs., LLC,*
    No. 1:18-CV-75, 2021 U.S. Dist. LEXIS 85577 (N.D.N.Y. May 5, 2021)............ 18, 20, 21, 25

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)................................................................................ 22, 23

*Consol. Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 1995) ........................................................................ 11

*Cortigiano v. Oceanview Manor Home for Adults,*
    227 F.R.D. 194 (E.D.N.Y. 2005) ........................................................... 9, 14

*Cutler v. Perales,*
    128 F.R.D. 39 (S.D.N.Y. 1989) .............................................................. 15

*D.S. ex rel. S.S. v. N.Y.C. Dep't of Educ.,*
    255 F.R.D. 59 (E.D.N.Y. 2008) .............................................................. 16

*Daniels v. City of New York,*
    198 F.R.D. 409 (S.D.N.Y. 2001) ............................................................ 12

*Deposit Guar. Nat'l Bank v. Roper,*
    445 U.S. 326 (1980)............................................................................. 8

*Enea v. Bloomberg, L.P.,*
    No. 12 Civ. 4656, 2014 U.S. Dist. LEXIS 35613 (S.D.N.Y. Mar. 17, 2014) ......................... 22

*Famular v. Whirlpool Corp.,*
    No. 16 CV 944 (VB), 2019 U.S. Dist. LEXIS 44907 (S.D.N.Y. Mar. 18, 2019) ................... 22

*Finch v. N.Y. State Office of Children & Family Servs.*,
   252 F.R.D. 192 (S.D.N.Y. 2008) ................................................................ 14

*Godson v. Eltman, Eltman, & Cooper, P.C.*,
   328 F.R.D. 35 (W.D.N.Y. 2018) ......................................................... 11, 18

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
   317 F.R.D. 374 (S.D.N.Y. 2016) .................................................................. 9

*Gortat v. Capala Bros., Inc.*,
   No. 07-cv-3629, 2012 U.S. Dist. LEXIS 47066 (E.D.N.Y. Apr. 3, 2012) ................................ 8

*Gucciardo v. Titanium Constr. Servs., Inc.*,
   No. 16-1113, 2017 U.S. Dist. LEXIS 109727 (S.D.N.Y Aug. 30, 2017) ................................ 10

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) ......................................................................................... 8

*Haley v. Teachers Ins. & Annuity Ass'n of Am.*,
   337 F.R.D. 462 (S.D.N.Y. 2020) ................................................... 12, 13, 21

*Hirschfeld v. Stone*,
   193 F.R.D. 175 (S.D.N.Y. 2000) ............................................................... 16

*In Re "Agent Orange" Prod. Liab. Litig.*,
   818 F.2d 145 (2d Cir. 1987) ...................................................................... 12

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) ("*BOA ERISA*") ................................... 11

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ................................................................. 24

*In re Blech Sec. Litig.*,
   187 F.R.D. 97 (S.D.N.Y. 1999) ............................................................. 9, 11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ........................................................................ 16

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*,
   241 F.R.D. 435 (S.D.N.Y. 2007) ............................................................... 14

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................... 18

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ................................................................................ 9, 12, 19, 25

*In re Petrobras Secs.*,
    862 F.3d 250 (2d Cir. 2017) ................................................................................ 21

*Jacob v. Duane Reade, Inc.*,
    293 F.R.D. 578 (S.D.N.Y. 2013) ......................................................................... 25

*Kelen v. World Fin. Network Nat'l Bank*,
    295 F.R.D. 87 (S.D.N.Y. 2013) ........................................................................... 17

*Labbate-D'Alauro v.* GC *Servs Ltd. P'ship*,
    168 F.R.D. 451 (E.D.N.Y. 1996) ........................................................................ 20

*LaRocque v. TRS Recovery Servs.*,
    No. 11-CV-91, 2013 U.S. Dist. LEXIS 314 (D. Me. Jan. 2, 2013) ....................... 10

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................................... 22

*Mailloux v. Arrow Fin. Servs.*,
    204 F.R.D. 38 (E.D.N.Y. 2001) .......................................................................... 10

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ................................................................................ 9, 10, 12

*Montano v. First Light Fed. Credit Union (In re Montano)*,
    398 B.R. 47 (Bankr. D.N.M. 2008) ..................................................................... 23

*Ray M v. Bd. of Educ.*,
    884 F. Supp. 696 (E.D.N.Y. 1995) ...................................................................... 14

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ................................................................................ 11, 14, 15

*Robinson v. Metro-North Commuter R.R.*,
    267 F.3d 147 (2d Cir. 2001) ................................................................................ 14

*Seijas v. Republic of Arg.*,
    606 F.3d 53 (2d Cir. 2010) .................................................................................. 20

*Sykes v. Mel Harris & Assocs. LLC*,
    285 F.R.D. 279 (S.D.N.Y. 2012) ......................................................................... passim

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015) ............................................................................ 8, 9, 22

*Torres v. Toback, Bernstein, Reiss LLP*,
   No. 11-CV-1368, 2014 U.S. Dist. LEXIS 36925 (E.D.N.Y. Mar. 29, 2014) .......................... 10

*Ventura v. N.Y.C. Health & Hosp. Corp.*,
   125 F.R.D. 595 (S.D.N.Y. 1989) ......................................................................... 16

## Statutes

15 U.S.C. § 1692 et seq. .................................................................................... passim

N.Y. Gen. Bus. Law § 349 .................................................................................. passim

N.Y. Judiciary Law § 487 ............................................................................... 1, 13, 15

## Other Authorities

"Errors and Gotchas: How Credit Report Errors and Unreliable Credit Scores Hurt Consumers",
   Consumers Union of U.S., Inc. (Apr. 2014) .......................................................... 24

"The Use of Cash-Flow Data in Underwriting Credit Market Context & Policy Analysis",
   FinRegLab (Feb. 2020) ................................................................................. 25

## Rules

Fed. R. Civ. P. 23 ........................................................................................... passim

## Treatises

Herbert Newberg & Alba Conte, *Newberg on Class Action* § 4.25 (4th ed. 2002) ...................... 17

Named Plaintiffs Katherine Seaman, Mary Re Seaman, Sandra Tabar, Christina Bifulco, Francis Butry, and Cori Frauenhofer ("Named Plaintiffs"), individually and on behalf of the class of all others similarly situated (the "Class") (together, "Plaintiffs"), respectfully submit this memorandum of law in support of their motion for class certification pursuant to Rule 23.

Discovery has revealed that Defendants[1] have no evidence of the existence and their ownership of the purported student loans on which they sought to collect.  Despite lacking this, Defendants nevertheless had a small group of attorneys and professional robo-signers prepare state-court filings falsely attesting to possession and review of the required actual proof of the existence and their ownership of the alleged loans.

These false filings allowed Defendants to file thousands of state-court actions throughout the nation that they never intended to and did not take to trial.  Through this scheme, Defendants committed thousands of violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") throughout the country, and in New York violated General Business Law ("GBL") § 349, and Judiciary Law § 487.

This case is appropriate for class treatment under Rule 23, given the uniformity of Defendants' abuses.  Defendants' unlawful practices were governed by the same set of policies and procedures, and implemented by a small number of people relying on computerized systems

---

[1] "Defendants" as used herein collectively refers to: National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-2, and National Collegiate Student Loan Trust 2007-3 (together, the "Trusts" or "Trust Defendants"); Transworld Systems, Inc. ("Transworld"), in its own right and as successor to NCO Financial Systems, Inc. ("NCO"); EGS Financial Care Inc. ("EGS"), formerly known as NCO Financial Systems, Inc. (together, "TSI-NCO"); and Forster & Garbus LLP ("Forster").

1

following uniform processes.  Accordingly, common proof of Plaintiffs' claims is contained in Defendants' own databases and records.[2]

The discovery here confirms and builds upon the Consumer Financial Protection Bureau's ("CFPB") September 2017 regulatory findings against Defendants for the same systemic violations alleged here.  This Court should certify the National Class here—all individuals named in a state-court action where one of the four Trust Defendants was the plaintiff.

I.     **COMMON FACTS**

   **A. Defendants' Business Model: Complex Assignments And Securitizations**

National Collegiate's fifteen constituent trusts—including the four Trust Defendants here—were created between approximately 2001 and 2007 by First Marblehead Corp., which used its subsidiary, The National Collegiate Funding LLC, to make bulk purchases of student loans purportedly originated by large lenders.  *See* Hawkins Decl. ¶ 3.[3]  The National Collegiate Funding LLC later assigned "pools" of loans en masse to the National Collegiate trusts, each of which then securitized and issued asset-backed securities.  *Id.*  The Trust Defendants here hold alleged loan debts against thousands of individuals throughout the country.  New York alone, the Trusts hold more than 15,000 loans purportedly extended to New York consumers, with the principal amounts thereupon totaling more than $190 million.  According to the Trusts' securities filings, all loans throughout the country that came to be owned by the Trusts followed this same assignment process. ¶ 3.

---

[2]  A default judgment is obtained in the majority of state-court collection actions benefitting the Trusts, according to discovery in this litigation.  Among other factors, Defendants seek default judgment as soon as allowable under state-court rules.

[3]  References in this Common Facts section to "¶ __" are to paragraphs of the Declaration of Asher Hawkins in support of the instant motion.  All references herein to paragraphs of the Hawkins Declaration encompass the exhibits cited in those paragraphs.

The Trust Defendants—like all National Collegiate trusts—have no employees.  Instead, they employ TSI-NCO a national debt-collection company, as "servicing agents" for "accounts," i.e., coordinating and effectuating the collection of debts purportedly owed on student loans said to be held by the Trusts.  Previously, yet another company, the Pennsylvania Higher Education Assistance Agency ("PHEAA"), had serviced National Collegiate accounts before they were transferred to TSI-NCO for litigation-based collection efforts.  ¶ 6.  TSI-NCO in turn employed a "Network" of outside debt-collection law firms including Forster to file state-court debt-collection lawsuits against individuals such as Named Plaintiffs, alleged to owe such debts.  ¶¶ 6–8.  The National Class that Named Plaintiffs represent consists of approximately 90,930 individuals across the country whom Defendants sued in state court for the benefit of one of the Trust Defendants; there are approximately 6,365 in the New York Class of which Named Plaintiffs are also members.  The majority of these suits were filed between late 2012 and mid-2017, when the CFPB penalized National Collegiate and TSI-NCO after finding such suits had been fraudulent.  ¶¶ 24, 39.

The CFPB's actions revealed that National Collegiate and TSI-NCO lacked documentation to prove key details about alleged loan debts—namely, whether there was valid chain-of-title starting with the originating lender and continuing through all assignments up to the Trust believed to own the loan.  A primary investor in National Collegiate—who eventually sued TSI-NCO and others, on behalf of the Trusts, in the Delaware Court of Chancery, alleging fraud—commissioned an audit which focused on the lists of loans or "schedules" that were supposed to contemporaneously record which loan, from which bank, to which consumer, was part of which Trust securitization, and in what amount.  With thousands of purported loans being assigned and securitized in quick succession, keeping track was a complex, but mandatory, task.  The audit concluded that schedules (if they ever existed) had gone missing or were not properly maintained,

leaving the Trusts unable to prove chain of assignment if challenged in state court.  Class members were sued as a matter of policy despite this lack of proof.  ¶¶ 5, 41.

### B. Defendants' Employees Were Required To Generate Deceptive Court Filings

#### 1. *The Network Firms And Attorneys*

The Network Firms retained by TSI-NCO to file suits for National Collegiate work on contingency, and their ability to retain National Collegiate's business is dependent on TSI-NCO's assessment of their speed and efficiency in collecting on debts.  One of the Network Firms, Defendant Forster, a Long Island, N.Y.-based debt-collection law firm, has filed thousands of lawsuits against New Yorkers in its role as a Network Firm.  In the CFPB's May 2019 action against Forster for work performed for National Collegiate, the agency determined that Forster's business model focuses on litigation volume, not compliance with the law.  As discovery here confirmed, an army of non-attorney support staff and computer systems (1) communicate collection-related information to and from clients like TSI-NCO and National Collegiate, and (2) auto-generate court filings such as those used against Plaintiffs.  ¶¶ 19–20.

Forster and all other Network Firms have computer systems which they program to follow a uniform set of codes for communications back and forth with TSI-NCO concerning individual National Collegiate accounts.  Events like filing of suit in state court, entry of default judgment, garnishment executions, and countless others each have their own unique code.  Meanwhile, data points concerning each event are uploaded—e.g., the court where the suit was filed, the amount of a judgment.  TSI-NCO supplies each Network Firm, including Forster, with a "standard operating procedure" ("SOP") requiring that they uniformly record all code events and upload all corresponding data for every Trust account that they work on.  ¶¶ 8–10, 28–34.

The SOP also makes clear that Network Firms will not receive, and cannot request, documentation of (1) chain of title proving Trust ownership of loans, or (2) what terms and conditions governed loans purportedly owned by Trusts.  Instead, Network Firms were required in all instances to automatically prosecute suits based on data points provided by TSI-NCO, and to seek default judgment as soon as possible.  Forster's 30(b)(6) witness testified that the firm followed this policy of non-access in suing Class members.  ¶¶ 11–12.

2.  *TSI-NCO's Affiant Team*

TSI-NCO employed a team of employees (the "Affiant Team"), who (1) signed the affidavits used to procure state-court judgments in favor of the Trusts and against accused debtors including Named Plaintiffs, and (2) testify as the Trust's witness in state court on the rare occasion an action against a consumer proceeded to trial.  At any given time, the Affiant Team consisted of no more than six members, each required to sign roughly 45 to 60 affidavits daily.  The affidavits were based on templates with boilerplate language into which data points like dollar amounts were auto populated.  Like the Network Firms, the Affiant Team were precluded by official TSI-NCO policy from confirming chain of assignment, or the terms governing underlying loan agreements, before signing sworn statements to benefit the Trusts.  The Affiant Team were required to trust on faith the dollar amounts and the like in TSI-NCO's computer system, but could not tell for themselves how these were arrived at, because TSI-NCO never received a glossary of the account codes that were inputted from PHEAA, the pre-suit servicer.  ¶¶ 7, 22–27.

**C.  Defendants Used Fraudulent Collection Suits And Affidavits**

*1.  Lawsuits And Affidavits Were Uniformly Prepared And Filed In State Court*

The pleadings and affidavits that Defendants filed in state court against the Class members were based on the same templates and boilerplate language and they all repeat the same false statements and misrepresentations.  For example, each affidavit contains these sentences:

o  "I am competent and authorized to testify relating to this action through personal knowledge of the business records, including the electronic data, sent to [TSI-NCO] that detail the education loan records."

o  "I also have personal knowledge of the record management practices and procedures of Plaintiff [i.e., the Trust] and the practices and procedures [the Trust] requires of its loan servicers and other agents."

o  "This lawsuit arose out of an unpaid loan or loans owed by [the Class member] to [the Trust]."

o  "I have reviewed the education loan records as business records described in this affidavit . . .. [Class member] owe the [dollar amount being sued upon]."

These statements are false.  None of the Affiant Team members who swore to these affidavits had "personal knowledge" of the business records pertaining to the alleged debt, or of the recordkeeping by which any such documents were created and maintained, reviewed any education loan records.  The Affiant Team members were not provided chain-of-title records, records reflecting governing terms and conditions, how the dollar amounts were calculated or what the amount consisted of (original amount, interest, fees, etc.), or even the codes appearing in TSI-NCO's own computer systems.  ¶¶ 22–27.

*2.  Defendants' Collection Suits Cause Class Members Uniform Damages*

Defendants' collection suits caused all Class members to suffer the same series of harms, in addition to the statutory damages, that uniformly and automatically attach to their violations. First, at the same time as suits were initiated, TSI-NCO reported the underlying alleged debts to all three major credit bureaus (Equifax, Experian, Trans Union) as owed by Class members and

subject to litigation.  In addition to appearing on credit reports, such adverse events are factored into consumers' credit scores so as to drag them down indefinitely.  Second, Defendants used the suits to collect money from Class members by either (1) obtaining default judgment and then income executions for wage garnishments, or (2) forcing Class members to enter payment arrangements.  All of these events and amounts were tracked at the individual-account level through Defendants' computerized coding and data-upload processes.  ¶¶ 21, 28–34.

### D.  The Discovery Granted To Plaintiffs For Class Certification

Pursuant to this Court's Order granting pre-certification sampling discovery,[4] the Parties conferred to agree on sampling methodology as to 5% of the New York Class, which methodology could eventually be replicated on a state-by-state basis.  Ultimately the agreed methodology was that Defendants produce the state-court case file for each lawsuit benefitting a Trust Defendant, plus documents that (1) potentially evidence the alleged loan sued upon, and (2) show payments made.  ¶¶ 35–36.

Defendants identified 3,914 accounts subject to state-court suits in New York where one of the four Trust Defendants was the plaintiff.  This is not the exact number of the New York class, because (1) loans allegedly owned by a Trust generally involve two alleged debtors, a "primary borrower" and a "co-borrower," and (2) Defendants have a policy of suing alleged debtors in their home state, and in certain instances one of the two alleged "borrowers" was identified by Defendants as no longer residing in New York at the time suit was filed.  ¶¶ 37–38.

Of the 198 New York-suit accounts (roughly 5% of the total) for which Defendants produced documents pursuant to the sampling methodology, Defendants' records identify 384 individuals whom Defendants describe as "borrowers," and 322 individuals named as defendants

---

[4]  Reported at 2020 U.S. Dist. LEXIS 140889.

in the corresponding suits.  Based on this, there are approximately 6,365 members of the New

York class, and 90,930 in the National Class.  The sampling methodology used here thus far can

be easily replicated on a state-by-state basis: the document types that Defendants have produced

for the New York Class exist for every individual whom Defendants have sued outside of New

York, and TSI-NCO's computer systems contain specific codes and electronic communications

identifying which individuals have been sued for the benefit of the Trust, and in which state by

which Network Firm.  ¶¶ 37–39.

## II.    STANDARD OF REVIEW

The Supreme Court has emphasized that "[c]lass actions serve an important function in our

system of civil justice."  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981).  "Supreme Court

precedent recognizes that the class action device is the only economically rational alternative when

a large group of individuals or entities has suffered an alleged wrong, but the damages due to any

single individual or entity are too small to justify bringing an individual action."  *Gortat v. Capala

Bros., Inc.*, No. 07-cv-3629, 2012 U.S. Dist. LEXIS 47066, at *14 (E.D.N.Y. Apr. 3, 2012)

(Glasser, J.), *aff'd*, 568 F. App'x 78 (2d Cir. 2014); *see also Deposit Guar. Nat'l Bank v. Roper*,

445 U.S. 326, 338 (1980).  "'The policy at the very core of the class action mechanism is to

overcome the problem that small recoveries do not provide the incentive for any individual to bring

a solo action prosecuting his or her rights.'"  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70,

81 (2d Cir. 2015) ("*Sykes III*") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617

(1997)).

To maintain a suit as a class action under Rule 23 a plaintiff must demonstrate each of the

following four threshold requirements: (1) the class is so numerous that joinder of all members is

impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses

of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

In addition, plaintiffs seeking monetary relief must satisfy Rule 23(b)(3) by demonstrating that questions of law or fact common to the members of the proposed class "predominate over any questions affecting only individual members," and that a class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy."  *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006); *see* Fed. R. Civ. P. 23(a) & -(b)(3).  Finally, plaintiffs may seek injunctive and equitable relief where the misconduct to be enjoined applies to all class members and such relief will benefit the class overall.  *See* Fed. R. Civ. P. 23(b)(2), *Sykes III*, 780 F.3d at 97.

Any doubt as to the propriety of certification should be resolved in favor of certifying the class because denial will almost certainly terminate the action and be detrimental to the class members.  *See Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997); *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) (Sweet, J.).  "[T]he Second Circuit's general preference is for granting rather than denying class certification."  *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 203 (E.D.N.Y. 2005) (Glasser, J.).

While "a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 385 (S.D.N.Y. 2016) (Roman, J.) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013)).  "[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision."  *Amgen*, 568

U.S. at 466.   Further, "[t]he Second Circuit gives Rule 23 a 'liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.'"   *Gucciardo v. Titanium Constr. Servs., Inc.*, No. 16-1113, 2017 U.S. Dist. LEXIS 109727, at *7 (S.D.N.Y Aug. 30, 2017) (Schofield, J.) (quoting *Marisol A.*, 126 F.3d at 377).

## III.   CLASS DEFINITIONS

The definition for the National Class to be certified pursuant to Rule 23(b)(3) is: "(a) all persons sued in state-court lawsuits related to the collection of consumer debt, (b) in which any Trust Defendant was identified as plaintiff in the complaint, (c) from February 27, 2012 through February 27, 2018."

For the purposes of notice and application of any statutory damages cap, the National Class should be subdivided such that there is a Rule 23(b)(3) class for each Trust and each state.[5]   Thus, the subclass definition would follow this exemplar for specifying the state and the Trust: "(a) all persons sued in [name of State] state-court lawsuits related to the collection of consumer debt, (b) in which any Trust Defendant was the plaintiff, (c) from February 27, 2012 through February 27, 2018."

Finally, the proposed Rule 23(b)(2) Class should be defined as follows: "(a) all persons sued in state-court lawsuits related to the collection of consumer debt, (b) in which any Trust Defendant was the plaintiff, and (c) against whom TSI-NCO reported the alleged debt to Equifax, Experian, and/or Trans Union."   No subclasses are required.

---

[5]   *See, e.g.*, *Torres v. Toback, Bernstein, Reiss LLP*, No. 11-CV-1368, 2014 U.S. Dist. LEXIS 36925, at *25–26 (E.D.N.Y. Mar. 29, 2014) (Pohorelsky, Mag. J.) (applying FDCPA's cap on a subclass-by-subclass basis), *adopted*, 2014 U.S. Dist. LEXIS 44883 (E.D.N.Y. Mar. 31, 2014) (Garaufis, J.); *LaRocque v. TRS Recovery Servs.*, No. 11-CV-91, 2013 U.S. Dist. LEXIS 314, at *5–6 (D. Me. Jan. 2, 2013) (approving "identical classes of plaintiffs in different states") (citing, inter alia, *Mailloux v. Arrow Fin. Servs.*, 204 F.R.D. 38, 43 (E.D.N.Y. 2001) (Trager, J.)).

## IV.  ARGUMENT

### A.  The Class Satisfies Rule 23(a)

*1.  The Class Is So Numerous That Joinder Of All Members Is Impracticable*

There is no dispute here that the Class, including all sub-classes, consists of thousands of individuals, such that its size makes joinder of all individual class members impracticable.  *See* Fed. R. Civ. P. 23(a)(l).  "Impracticability" under Rule 23(a)(1) "means difficulty or inconvenience of joinder; the rule does not require impossibility of joinder."  *Blech*, 187 F.R.D. at 103; *see also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).  Plaintiffs need not show evidence of exact class size or identity of class members in order to satisfy Rule 23's numerosity requirement.  *Blech*, 187 F.R.D. at 103.

Within the Second Circuit, numerosity is presumed if the class has at least 40 members.  *E.g.*, *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012) ("*BOA ERISA*") (Castel, J.).  Plaintiffs need not show evidence of exact class size or identity of class members in order to satisfy Rule 23's numerosity requirement.  *BOA ERISA*, 281 F.R.D. at 138.

Here, the Class consists of roughly 6,365 members in New York alone; many thousands more exist throughout the country.  *See* Hawkins Decl. ¶¶ 38–39.  Any argument that the proposed Class does not satisfy the numerosity prerequisite is frivolous.  *BOA ERISA*, 281 F.R.D. at 138.  Courts have regularly certified far less numerous classes, including of victims of fraudulent debt collection schemes.  *E.g.*, *Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 47–48 (W.D.N.Y. 2018) (Wolford, J.) (certifying class of 270 individuals whose FDCPA rights were violated).

2. *There Are Questions Of Law And Fact Common To The Class*

Common issues abound here, easily satisfying Rule 23(a)(2).  All Plaintiffs' claims and injuries derive from a unitary course of conduct: Defendants' scheme to fraudulently sue consumers in state courts over unprovable debts.  "The fact that the claims of the proposed class stem from the same alleged [illegal] conduct of the defendants proves the existence of common questions of law or fact."  *Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) (Scheindlin, J.); *accord, e.g.*, *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012) ("*Sykes II*") (Chin, J.)

Rule 23(a)(2) does not require that all questions of law or fact be common to the class, but only that the named plaintiffs share at least one question of fact or law with the rest of the putative class. *Marisol A.*, 126 F.3d at 377; *Daniels*, 198 F.R.D. at 417 (citing *In Re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir. 1987)).  Factual differences among the claims of class members do not preclude a finding of commonality.  *E.g.*, *Haley v. Teachers Ins. & Annuity Ass'n of Am.*, 337 F.R.D. 462, 471 (S.D.N.Y. 2020) (Oetken, J.) (citing *Sykes II*); *Daniels*, 198 F.R.D. at 417.  This is particularly true where, as here, the plaintiffs challenge a common policy or practice as the source of the harm that the defendants caused them.  *Daniels,* 198 F.R.D. at 417; *see also Marisol A.,* 126 F.3d at 376–77.

Here, a glance back at the briefs concerning Defendants' Rule 12 motions confirms the many common questions of law and fact at the core of Plaintiffs' claims.  Importantly, legal issues that were raised and resolved as in that motion practice remain common issues for purposes of class certification even though they are now the law of the case.  *Nassau Cnty.*, 461 F.3d at 228 (2d Cir. 2006) ("Even resolved questions continue to implicate the 'common nucleus of operative

facts and issues' with which the predominance inquiry is concerned.").  Some questions of law and fact common to all Class members include, without limitation:

(i)     whether Defendants initiated state-court collection suits against Class members without possession of proof of indebtedness;

(ii)    whether Defendants initiated state-court collection suits against Class members without review of proof of indebtedness;

(iii)   whether Defendants' state-court affidavits were false and misleading;

(iv)    whether Defendants' employees who signed such affidavits were required by policy not to ask for nor review proof of indebtedness;

(v)     whether Defendants' attorney affirmations were false and misleading;

(vi)    whether Defendants' attorneys who signed such affirmations were required by policy not to ask for nor review proof of indebtedness;

(vii)   whether Defendants reported Class members as debtors to credit bureaus without possession of proof of indebtedness;

(viii)  whether Defendants reported Class members as debtors to credit bureaus without review of proof of indebtedness;

(ix)    whether Defendants' actions violated the FDCPA;

(x)     whether Defendants' actions violated GBL § 349 (for the New York sub-class);

(xi)    whether Defendants' actions violated Judiciary Law § 487 (for the New York sub-class); and,

(xii)   the nature and scope of appropriate declaratory and/or injunctive relief.

These are just some of the key legal and factual issues in the case, and they are common to all Class members.  *E.g.*, *Haley*, 337 F.R.D. at 471 (common question of law is legality of defendants' policy and procedure); *Burley v. City of N.Y.*, No. 03 Civ. 735, 2005 U.S. Dist. LEXIS 4439, at *13–14 (S.D.N.Y. Mar. 23, 2005) (Pauley, J.) (same).

Defendants' policy and procedure was to use computer systems to transmit data about individuals to be sued—names, addresses, and dollar amounts—to generate false and deceptive court filings.  Through such systems, TSI-NCO directed Forster to initiate lawsuits, and Forster then automatically generated uniform complaints to file in state court.  Later, the automatic generation process was repeated to create affidavits in support of suit, which were also generated uniformly to include boilerplate language about possession and review of proof of indebtedness.

13

Members of TSI-NCO's Affiant Team robo-signed dozens of such affidavits a day. *See* Hawkins Decl. ¶ 25.[6]

Because Plaintiffs are "challenging a practice of defendants," not merely Defendants' "conduct with respect to the individual plaintiff[s]," the commonality requirement is readily met. *Ray M v. Bd. of Educ.,* 884 F. Supp. 696, 699 (E.D.N.Y. 1995) (Nickerson, J.); *see, e.g.*, *Sykes II*, 285 F.R.D. at 291; *see also Finch v. N.Y. State Office of Children & Family Servs.*, 252 F.R.D. 192, 201 (S.D.N.Y. 2008) (Scheindlin, J.) (commonality met because "any variation in the reasons for each person's [harm] does not negate the common questions of fact and law surrounding [defendant's injurious] policies").

### 3. *Named Plaintiffs' Claims Are Typical Of The Class's Claims*

Rule 23(a)(3)'s typicality requirement is satisfied because the proposed Class representatives' claims arise from the same general "course of events" as those of the absent Class members and rely on "similar legal arguments" to prove Defendants' liability. *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001); *accord, e.g.*, *Sykes II*, 285 F.R.D. at 287.

The typicality requirement "directs the []court to focus on whether the named representatives' <u>claims</u> have the same essential characteristics as the claims of the class at large," rather than the specific facts giving rise to the claims. *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 241 F.R.D. 435, 444 (S.D.N.Y. 2007) (Scheindlin, J.).[7]  Even if proposed representatives and absent members experienced somewhat differing forms of harm, what matters

---

[6]  Per the confidentiality order, Plaintiffs provide in this brief only a general description of Defendants' computer systems and automatic generation processes.  These are described in greater detail in the accompanying Hawkins Declaration, which has been filed entirely under seal.

[7]  *See also Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 206 (E.D.N.Y. 2005) (Glasser, J.) ("The fact that there may be slight variations in how defendants treated different plaintiffs (or putative class members) does not render the claims atypical.") (citing *Robidoux*, 987 F.2d at 937).

for typicality purposes is that these harms arose from the defendants' mistreating them all "in the same general fashion." *Robidoux*, 987 F.2d at 937. "[V]iewed in the most practical way, typicality is present when all members of the putative class would benefit by the success of the named plaintiff[s]." *Cutler v. Perales*, 128 F.R.D. 39, 45 (S.D.N.Y. 1989) (Leisure, J.).

Here, the violations suffered by Named Plaintiffs are typical of those of the National Class members they seek to represent. Named Plaintiffs' claims arise from the same course of illegal conduct—Defendants' collect efforts though fraudulent collection lawsuits—that gives rise to the claims of all the other National Class members, and are based upon the same legal theories as those of the Class. This conduct violates the National Class's statutory rights under the FDCPA, as well as the GBL and the Judiciary Law for New York Class members.

Specifically, each Named Plaintiff was sued in a state court using the same automatically generated pleadings containing the same boilerplate language with the same deceptive assertions as were filed against all Class members. Further, like most Class members, each Named Plaintiff was ultimately subject to default judgment on the basis of the same automatically generated affidavits containing the same boilerplate language with the same fraudulent assertions. Default judgment was the outcome of the substantial majority of Defendants' state-court lawsuits, according to the class discovery here. *See* Hawkins Decl. ¶ 40.[8]

---

[8] According to the sampling discovery, in roughly a quarter of the lawsuits Class members settled. (Needless to say, Defendants did not reveal that it could not demonstrate ownership of the loan or justify the amount.) In roughly a fifth of the lawsuits, Defendants lost, discontinued, or abandoned the lawsuit, including in cases where the Class members appeared to defend themselves. In only roughly 1.5% of cases did Defendants prevail in state court against a Class member who appeared to defend themself. *Id.*

Further, Defendants' unlawful practices were implemented uniformly throughout the nation. Their policy and procedure was to sue Class members in whichever state they were located, despite not possessing and reviewing proof of indebtedness. *Id.* ¶ 39.

These common claims are central to both the damages claims and the request for injunctive and other equitable relief. Thus, "by advancing their own interests, [the named] plaintiffs will advance the interests of the class." *Ventura v. N.Y.C. Health & Hosp. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989) (Walker, J.).[9]

### 4. *Named Plaintiffs And Their Counsel Will Fairly And Adequately Represent The Class*

Rule 23(a)(4)'s requirement for fair and adequate class representation is satisfied here because (1) Named Plaintiffs' claims and interests are not antagonistic to the Class's, and (2) their counsel are qualified and experienced attorneys capable of prosecuting this class litigation. *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).

First, Named Plaintiffs have no conflict with any other Class member, and will fairly and adequately protect the interests of the Class. Named Plaintiffs are adequate representatives because they were subjected to the same unlawful conduct as the Class members—being sued in state court over unprovable debts, and consequential harms such as negative credit reporting and garnishments. *E.g.*, *Sykes II*, 285 F.R.D. at 292; *Hirschfeld v. Stone,* 193 F.R.D. 175, 183 (S.D.N.Y. 2000) (Pauley, J.). Because Named Plaintiffs: (1) have suffered injury which is to be remedied by class relief; (2) intend to pursue claims that will secure relief for the class; and (3)

---

[9]   *See also D.S. ex rel. S.S. v. N.Y.C. Dep't of Educ.*, 255 F.R.D. 59, 71–72 (E.D.N.Y. 2008) (Weinstein, J.) ("Named plaintiffs and other class members have faced similar illegal exclusions from educational services to which they are entitled. While these exclusions were effectuated in a variety of ways[,] defendants' general practices and course of conduct and the harms suffered by class . . . members satisfy the typicality requirement for purposes of class certification.").

seek equitable and injunctive relief which will benefit the entire class, the Named Plaintiffs are adequate class representatives. *Hirschfeld,* 193 F.R.D. at 183.

Further, Named Plaintiffs' adequacy is confirmed by their extensive involvement in this case. In addition to each having been deposed for full days, they have produced hundreds of pages of documents in their possession, answered extensive interrogatories, and communicated extensively with counsel. There being no doubt about their good-faith commitment to this litigation, they are presumed adequate. *Kelen v. World Fin. Network Nat'l Bank*, 295 F.R.D. 87, 93 (S.D.N.Y. 2013) (Crotty, J.).

Second, Plaintiffs' counsel are well qualified to handle this case as a class action. Frank LLP has extensive experience representing individuals and small businesses in class actions against large companies asserting claims of financial fraud. *See* Hawkins Decl. ¶¶ 42. Notably, Frank LLP recently litigated to settlement before Judge Daniels a class action suit alleging debt buyers sued individuals in state court over unprovable credit-card debts. *See, e.g.*, Approval Ord. & J., *Toohey v. Portfolio Recovery Assocs., LLC*, No. 15-cv-8098 (S.D.N.Y. July 16, 2020) (ECF No. 135) (certifying Rule 23 class asserting, inter alia, FDCPA and GBL claims).

**B. A Rule 23(b)(3) Class Should Be Certified**

Rule 23(b)(3) certification is appropriate in cases in which common legal or factual issues predominate over individual issues and where a class action is superior to other methods of adjudication. *See* Fed. R. Civ. P. 23(b)(3). Courts look for an essential common link among class members capable of remediation through litigation. *See* Herbert Newberg & Alba Conte, *Newberg on Class Action* § 4.25 (4th ed. 2002). In this case, all Plaintiffs' claims revolve around two broad common questions with many constituent common parts: (1) whether Class members were victims of Defendants' uniform scheme to prosecute state-court collection suits by submitting false and

17

misleading filings and (2) whether that scheme violates the statutes invoked.  These questions and their many common subsidiary issues can and should be adjudicated on a class-wide basis.

     1.   *Common Issues Of Law And Fact Predominate*

Like Rule 23(a)'s typicality requirement, Rule 23(b)(3)'s predominance requirement is easily met here because the issues in this action are subject to generalized proof applicable to all Class members, and there is little to no chance "that individual issues will overwhelm the common questions."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996) (Sweet, J.); *see, e.g.*, *Godson*, 328 F.R.D. at 50 ("Whether or not [defendants'] collection [filings]—[submitted against] each member of th[is] Class—violated the FDCPA is the key factual and legal issue in this matter and can be readily resolved through generalized proof.  Therefore, the predominance requirement of Rule 23(b)(3) is satisfied." (quotation omitted)).

Here, because the consumer-protection statutes governing the claims require an objective (not subjective) standard, there will be no need to address whether each Class member was individually deceived by the deceptive state-court filings that Defendants used to target them.  Predominance of common issues of law is therefore ensured.  *Chery v. Conduent Educ. Servs., LLC*, No. 1:18-CV-75, 2021 U.S. Dist. LEXIS 85577, at *14 (N.D.N.Y. May 5, 2021) (Hurd, J.) (confirming predominance because "the question of whether an act or practice is materially misleading under GBL § 349 is an objective inquiry, and consumers do not have to prove that they actually relied on a misrepresentation" (quotation omitted)); *see also* Ord. of Oct. 11, 2019, 419 F. Supp. 3d at 700–01 (this Court emphasizes FDCPA and GBL's objective standard in denying Rule 12 dismissal); *cf.* Part IV.A.3 *supra* (listing common legal issues as to typicality).

Similarly, predominance of common fact issues is ensured here.  Plaintiffs will use common proof to establish Defendants' liability for the violations of their statutory rights.

Defendants' databases contain records of all individuals subjected to the scheme here, and when and in which state court each execution of the scheme occurred. Defendants' written policies and procedures show that, for each such execution, Defendants' affiants and attorneys were <u>required</u> to robo-sign statements falsely attesting to possession and review of proof of the debt. *See* Part III.B.1–2, *supra*. Because these databases constitute undisputed, class-wide evidence of facts concerning the illegal conduct that Plaintiffs suffered, predominance is met. *Nassau Cnty.*, 461 F.3d at 229 (2d Cir. 2006) (predominance where defendants possessed records detailing each individual's subjection to same mistreatment during class period).[10]

> 2.   *A Class Action Is Superior To All Other Methods Of Resolution*

A finding of predominance generally means that Rule 23(b)(3)'s superiority requirement is also met. In any event, superiority is met here because a class action "is, without question, more efficient than requiring thousands of [falsely accused] debtors to sue individually." *Sykes II*, 285 F.R.D. at 294 (confirming superiority of class resolution where defendants filed state-court collection suits en masse via fraudulent allegations of debt).

Factors relevant to the superiority under Rule 23(b)(3) include: "(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the

---

[10] *See also, e.g.*, *Enea v. Bloomberg, L.P.*, No. 12 Civ. 4656, 2014 U.S. Dist. LEXIS 35613, at *7, 19 (S.D.N.Y. Mar. 17, 2014) (Daniels, J.) (confirming predominance where class members can be identified "by defendants' own records"). The above-identified common facts are more than sufficient for predominance—even a single fact issue common to all class members justifies certification. *See Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 39–40 (D.D.C. 2003) (predominance requirement satisfied where plaintiffs raised "one common question of fact").

claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).  All factors are met here.  *See id.*

First, given the relatively small size of any individual recovery, it is unlikely that individual class members would bring their own claims.  Plaintiffs are generally hard-working individuals but of limited means and so unable to mount individual prosecutions against Defendants.  A class action is the sole practical means for redressing the wrongs committed here.  *See Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010) ("[T]he class action device is frequently superior to individual actions" when proceeding individually is cost "prohibitive" given the low value of claims relative to costs of individual litigation); *see also, e.g.*, *Labbate-D'Alauro v.* GC *Servs Ltd. P'ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) (Spatt, J.) (confirming superiority for class of FDCPA plaintiffs, given "inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually").

Second, Plaintiffs are not aware of any other active cases on the same issues here, let alone any that have progressed through discovery as here.  *See Chery*, 2021 U.S. Dist. LEXIS 85577, at *18.[11]  Third, concentrating litigation on behalf of all Class members in this forum will prevent inconsistent adjudications and will promote fair and efficient use of the judicial system.  *See* Fed. R. Civ. P. 23(b)(3)(C).  Among other considerations, hundreds if not thousands of Class members are located in the New York City area, the securitizations underlying Defendants' scheme were

---

[11]   There are two later-filed putative class actions in other circuits that accuse some Trust Defendants and TSI-NCO of unlawfully suing in state court.  However, these cases do not affect certification here, as they assert different claims and do not cover the timeframe during which Class members here were victimized.  In addition, no discovery has been taken in these actions. *See* Hawkins Decl. ¶ 44.

effectuated in Manhattan and under New York law, and this Court has already overseen years of complex discovery concerning the Class's claims. .

Finally, this Class is manageable.  "As the Second Circuit has cautioned, 'failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule.'"  *Chery*, 2021 U.S. Dist. LEXIS 85577, at *18 (quoting *In re Petrobras Secs.*, 862 F.3d 250, 268 (2d Cir. 2017)).  Moreover, refusal to certify here would make no sense given the ease with which Class members, and the details of their harms, can be uniformly identified via Defendants' records.  Even if there were any theoretical management problems here, the Court has a variety of "management tools . . . at its disposal" for addressing such situations.  *Sykes II*, 285 F.R.D. at 294 (confirming superiority per Rule 23(b)(3)(D)).

   3.   *This Class And Its Members' Harms Can Be Ascertained On Class-Wide Basis*

Courts generally read into Rule 23(b)(3) two additional requirements concerning efficacy of proceeding with class litigation as proposed.  First, Plaintiffs must show that the identities of the Class members may be objectively ascertainable pursuant to the class definition.  *Chery*, 2021 U.S. Dist. LEXIS 85577, at *18.  There is no dispute on this here, as Defendants' class discovery shows they can easily identify which individuals fall within the Class definition here, i.e., which persons Defendants have sued in state court.  *Id.*; *Sykes II*, 285 F.R.D. at 294; *see* Part III.D, *supra*.[12]

---

[12]  Even if the class discovery here were not so clean cut, courts reject arguments by class action defendants that their records are too complicated to permit ascertaining an objectively defined class.  *Haley*, 337 F.R.D. at 474 ("[T]his Court finds it difficult to believe, as [defendant] TIAA argues, that TIAA does not maintain records regarding whether a plan is governed by ERISA[;] such a determination is essential to the conduct of TIAA's business." (record citation omitted)).

Next, Plaintiffs must show that the harms which all Class members have suffered are "the result of the wrong" that Defendants committed, and so capable of class-wide measurement. *Sykes III*, 780 F.3d at 82 (citing, inter alia, *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013)). "Th[is] is not to say [P]laintiffs must be prepared [now] at the certification stage to demonstrate through common evidence the precise amount of damages incurred by each class member," but rather that "common evidence [may] show all class members suffered <u>some</u> injury." *Sykes III*, 780 F.3d at 82 (quotation omitted; emphasis original).[13]

As an initial matter, this Class's claims for statutory damages are inherently calculable on a class-wide basis: the statutorily prescribed per-violation dollar amounts are simply multiplied by the number of class members. *E.g.*, *Famular v. Whirlpool Corp.*, No. 16 CV 944 (VB), 2019 U.S. Dist. LEXIS 44907, at *26 (S.D.N.Y. Mar. 18, 2019) (Briccetti, J.) (confirming Rule 23(b)(3) certification where class-wide GBL damages were calculable by simple multiplication) (citing, inter alia, *Comcast*, 569 U.S. at 34).

As to the claims for actual damages, Rule 23(b)(3) certification is proper even if Class members' actual damages may differ on an individual basis. "[T]he amount of any money" that was "extracted from them as a result of [Defendants'] fraudulent" collection lawsuits—e.g., via wage garnishments—"is stored by [D]efendants themselves," and the efficiency from this accessibility outweighs any inefficiency of individualized calculation of damages. *Sykes III*, 780 F.3d at 88; *see also, e.g.*, *Enea v. Bloomberg, L.P.*, No. 12 Civ. 4656, 2014 U.S. Dist. LEXIS 35613, at *21 (S.D.N.Y. Mar. 17, 2014) (Daniels, J.) (Individual "damages will be calculated based

---

[13]   *See also, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (All that is required at class certification is that "the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability."); *accord Sykes III*, 780 F.3d at 88.

on the wages each [class member] lost due to Bloomberg's unlawful employment policies[, so] Plaintiffs' proposed measure of damages is directly linked with their theory of liability . . . .") (citing, inter alia, *Comcast*).[14]

### C.  A Separate Rule 23(b)(2) Class Also Should Be Certified

A Rule 23(b)(2) class should be certified where the defendant has acted on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  *See* Fed. R. Civ. P. 23(b)(2).  Additional certification of a Rule 23(b)(2) class is proper where the "defendants' uniform conduct" caused harms "that apply generally to the class" and are of an ongoing nature.  *Sykes II*, 285 F.R.D. at 294 (certifying separate classes under both Rule 23(b)(2) and 23(b)(3)).

Injunctive relief per Rule 23(b)(2) is especially fitting where, as here, the harm to a class of individuals is the result of a company's practice of improper credit reporting.  *See Montano v. First Light Fed. Credit Union (In re Montano)*, 398 B.R. 47, 57–58 (Bankr. D.N.M. 2008) ("Plaintiffs allege that First Light acted with the same behavior for all class members, i.e., incorrectly reporting credit data and then intentionally refusing to correct it. The relief requested by Plaintiffs includes . . . an injunction requiring First Light to correct all incorrect [credit reporting] information currently in existence").

---

[14]  Further, the law of this case bars any individualized inquiry that Defendants might demand as to whether Class members would have had money extracted from them eventually because they truly did sign for student loans as Defendants have alleged in state court.  Whether the loans were "real" or not is irrelevant because Defendants victimized Plaintiffs without verifying the debt alleged.  *See* Ord. of Oct. 11, 2019, 419 F. Supp. 3d at 707 n.23 (finding that Plaintiffs suffer actual damages under the FDCPA and GBL, whether or not the underlying debt alleged was real, because Defendants were only able to extract money from Plaintiffs by making deceptive statements in state court).

Named Plaintiffs additionally seek Rule 23(b)(2) certification to address the equitable relief necessary here.  Specifically, an injunction must be entered to stop the ongoing the harms caused by Defendants' reporting Class members' alleged debts to credit bureaus without possession or review of proof thereof.  Defendants have computer systems that constantly interface with corresponding systems at the major credit bureaus (Equifax, Experian, and Trans Union).  *See* Hawkins Decl. ¶ 30.  Since Defendants' policy is to credit-report each alleged debt contemporaneously with suing over it in state court, the equitable-relief Class is as ascertainable as the Rule 23(b)(3) one.  *See* Part IV.B, *supra*.

Cases analogous to this one frequently conclude with a requirement that FDCPA and GLB defendants contact the credit bureaus to remove reference to the alleged debts from Class members' credit histories.  *See, e.g.*, Approval Ord. & J., *Toohey v. Portfolio Recovery Assocs., LLC*, No. 15-cv-8098 (S.D.N.Y. July 16, 2020) (Daniels, J.) (ECF No. 135) (approving equitable relief for FDCPA and GBL class in the form of defendant-debt buyer's being required to cease reporting to credit bureaus the underlying alleged debts).[15]  To ensure replete equitable relief here, in addition to instructing credit reports be updated, Defendants also must instruct the credit bureaus and Fair Isaac Corp. ("FICO") to remove the alleged debts as data points visible to the proprietary algorithms they use to generate credit scores.[16]

---

[15]  Inasmuch as Defendants' credit-reporting on the underlying alleged debts caused the Class to suffer monetary damages through diminution of creditworthiness reputation, these may be assessed post-certification by expert analysis.  *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105–06 (S.D.N.Y. 2016) (Scheindlin, J.) (emphasizing that any "expert damages analysis" should be proffered after class certification).

[16]  *E.g.*, "Errors and Gotchas: How Credit Report Errors and Unreliable Credit Scores Hurt Consumers", at 5–6, Consumers Union of U.S., Inc. (Apr. 2014) (emphasizing that the "big three" credit bureaus and FICO use proprietary algorithms to generate credit scores based on data reflecting past negative reports), *available at* https://advocacy.consumerreports.org/wp-content/uploads/2014/04/Errors-and-Gotchas-report.pdf; *see also, e.g.*, "The Use of Cash-Flow Data in Underwriting Credit Market Context & Policy Analysis", at § 2 & n. 13, FinRegLab (Feb.

### D.  In The Alternative, This Court May Define And Certify A Liability Class

In the event this Court finds predominance lacking in any respect, this would not preclude certification.  Rather, this Court should take measures such as amending the Class definition(s), or certifying liability-only classes—whatever is necessary to "advance the disposition of the litigation of the whole."  *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 589 (S.D.N.Y. 2013) (Oetken, J.), *aff'd*, 602 F. App'x 3 (2d Cir. 2015); *see* Fed. R. Civ. P. 23(c)(4); *Nassau Cnty.*, 461 F.3d at 225 (emphasizing importance of Rule 23(c)(4)'s alternative measures).

### E.  Named Plaintiffs' Counsel Should Be Appointed Class Counsel

Named Plaintiffs' counsel, Frank LLP, should be appointed Class Counsel given their familiarity with and dedication to this litigation, which has seen substantial motion practice and discovery, including Rule 12 motion practice.  *Chery*, 2021 U.S. Dist. LEXIS 8557 (citing Fed. R. Civ. P. 23(g)(1)).  In addition to overseeing completion of staged class sampling beyond New York, Frank LLP represents the plaintiffs (including some Named Plaintiffs here) in a related action naming National Collegiate trusts not part of this consolidated litigation, and are coordinating discovery to avoid duplicative efforts.[17]  Completing this coordinated discovery is expected to be straightforward given the uniformity of process governing all of the National Collegiate trusts' state-court actions.  We anticipate supplemental Rule 23 and/or Rule 42 consolidation motion practice soon.  *See* Hawkins Decl. ¶ 43.

---

2020) (noting that these standard credit scores are generally adopted in whole by lenders in assessing the creditworthiness of individual consumers), *available at* https://finreglab.org/wp-content/uploads/2020/03/FinRegLab_Cash-Flow-Data-in-Underwriting-Credit_Market-Context-Policy-Analysis.pdf.

[17] *See Butry et al. v. Nat'l Collegiate Student Loan Trust 2005-3 et al.*, No. 20-cv-5843 (S.D.N.Y.) (filed July 28, 2020) (accepted as related to the instant consolidated litigation, Aug. 11, 2020).

## V.   **CONCLUSION**

For the reasons set forth above, Rule 23 certification should be granted.


Dated:      New York, New York
            June 3, 2021

                                    Respectfully submitted,

                                    **FRANK LLP**

                                    By:    _/s/ Gregory A.  Frank_
                                    Gregory A. Frank (GF0531)
                                    Marvin L. Frank (MF1436)
                                    Asher Hawkins (AH2333)
                                    305 Broadway, Suite 700
                                    New York, New York 10007
                                    Tel: (212) 682-1853
                                    Fax: (212) 682-1892
                                    gfrank@frankllp.com
                                    mfrank@frankllp.com
                                    ahawkins@frankllp.com

                                    _Attorneys for Plaintiff and the Class_