# Exhibit B

## to Hawkins Declaration

Plaintiffs' Motion for Class Certification

*Michelo et al. v. Nat'l Collegiate Student Loan Trust 2007-2 et al.*, No. 18-CV-1781

*Bifulco et al. v. Nat'l Collegiate Student Loan Trust 2004-2 et al.*, No. 18-CV-7692

Page 1

1

    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
    Civil Action No. 1:18-cv-017819(PGG)
3    - - - - - - - - - - - - - - - - - - -x
4    MUTINTA MICHELO, KATHERINE SEAMAN,
    MARY RE SEAMAN, and SANDRA TABAR,
5    individually and on behalf of all
    others similarly situated
6

                 Plaintiffs,
7

8       -against-
9

    NATIONAL COLLEGIATE STUDENT LOAN TRUST
10    2007-2, NATIONAL COLLEGIATE
    STUDENT LOAN TRUST 2007-3;
11    TRANSWORLD SYSTEMS, INC. in its own
    right and as successor to NCO FINANCIAL
12    SYSTEMS, INC.; EGS FINANCIAL CARE INC.,
    formerly known as NCO FINANCIAL SYSTEMS,
13    INC; and FORSTER & GARBUS LLP,
14                Defendants.
15    - - - - - - - - - - - - - - - - - - -x
    [Second caption on following page]
16
17                February 13, 2020
                10:03 a.m.
18
19       Deposition of BRADLEY LUKE,
20    taken by Plaintiffs, pursuant to
21    Notice, held at the offices of
22    Veritext Legal Solutions LLP, 1250
23    Broadway, New York, New York, before
24    Kathleen Piazza Luongo, a Notary
25    Public of the State of New York.

1                    Bradley Luke

2   not involved in signing affidavits ever

3   have that title?

4       A.    Not to my knowledge.

5       Q.    So that title could be used to

6   search exclusively for members of the

7   affiant team within TSI/NCO records; is

8   that right?

9             MR. SCHULTZ:  Object to the

10      form.

11      A.    I believe so.

12      Q.    So when a member of the affiant

13  team first joined the team were they

14  given a list of duties that they would

15  have to perform?

16      A.    I'm not sure if it was given to

17  them like in a list form.  Their job

18  function was described to them, um, and I

19  mean there are job duties, um, that were

20  outlined in the job posting.

21      Q.    Okay.

22            What were those duties that

23  were outlined in the job posting?

24      A.    Specifically I don't recall the

25  duties, um, that were specifically listed

1                     Bradley Luke

2        Q.      Were those the notes on the

3    bottom of the one exhibit where you said

4    "I wouldn't usually include this in a

5    production"?

6        A.      Yes.

7        Q.      What about eRecoverEase?

8        A.      ERecoverEase is an online

9    portal, um, basically a communication

10   portal, how our system transmits

11   information, where the law firm system

12   would pick up that information to import

13   into their system of record, and

14   likewise, they would send information

15   through eRecoverEase for CRS to pick up

16   and import.

17       Q.      So it was used as a go-between

18   for affiants and outside law firms

19   prosecuting state court lawsuits on

20   behalf of TSI/NCO?

21       A.      I wouldn't characterize it that

22   way.

23       Q.      Okay.

24               Then I guess I'm a little bit

25   confused, and maybe you can just explain

1                    Bradley Luke

2    for me in a little bit greater detail

3    what the purpose of your eRecoverEase

4    was.

5         A.    For the two different systems

6    to communicate with each other.

7         Q.    Which two different systems?

8         A.    CRS and whatever system the law

9    firm uses on their side.

10        Q.    Okay.

11              So an outside law firm like

12   Forster & Garbus would have their own

13   system for notes and activity about

14   individual accounts; is that right?

15        A.    Yes.

16        Q.    And TSI/NCO has its own system?

17        A.    Yes.

18        Q.    And eRecoverEase allows for

19   interaction between those two systems; is

20   that right?

21        A.    Yes.

22        Q.    I think that you referred to it

23   before as the Media Locator; is that

24   right?

25        A.    I made reference to that

1                      Bradley Luke

2       Q.      Okay.

3               Was there a method by which

4    TSI/NCO tracked whether employees or

5    affiants were logging into that system?

6       A.      I don't believe so.

7       Q.      Okay.

8               You mentioned before that

9    documents were printed out?

10      A.      Yes, sir.

11      Q.      Describe that process for me,

12   please.

13      A.      So typically when an affidavit

14   is requested, the affidavit production

15   team will merge that affidavit with the

16   data from that individual loan, um, and

17   print that out with a package of

18   documents that that affidavit references,

19   um, that package of documents being put

20   together by the media team.

21              They would print those two

22   together so that you'd have one package

23   of an affidavit followed by the exhibits

24   to that affidavit.

25              Those affidavit packages are

```
                                    Page 182
 1                  Bradley Luke
 2   then batched together in paper form to
 3   have multiple ones within what we call a
 4   batch.
 5           Currently there is no more than
 6   five affidavits per batch, so the affiant
 7   would grab that batch of five or less
 8   affidavits and bring it back to their
 9   desk and begin to work through each
10   individual affidavit.
11       Q.    You said a lot there so there
12   might be a few follow-up questions that I
13   have to go through with you.
14           You said that first there was a
15   request for an affidavit?
16       A.    Yes.
17       Q.    Is that the -- is that the
18   initial thing that happens when an
19   affidavit has to be created?
20       A.    Yes.
21       Q.    Where does that request come
22   from?
23       A.    The law firm.
24       Q.    Such as Forster & Garbus?
25       A.    Such as.
```

```
                                    Page 183
 1                    Bradley Luke
 2        Q.    And that would be in connection
 3    with, for example, a motion for default
 4    judgment; is that correct?
 5        A.    Potentially.
 6        Q.    So a request comes in from the
 7    law firm; right?
 8        A.    Yes.
 9        Q.    Is it sent to you
10    electronically?
11        A.    Yes.
12        Q.    It comes from the law firm's
13    electronic records-keeping system?
14              MR. SCHULTZ:  Object to the
15        form.
16        A.    Yes.
17        Q.    It goes through eRecoverEase?
18        A.    Yes.
19        Q.    And then what system at TSI/NCO
20    picks that up?
21        A.    So at that point that code goes
22    into CRS.  It also goes --
23        Q.    What is that code?
24        A.    The electronic request code.
25        Q.    What was it?
```

Page 184

1                      Bradley Luke

2       A.      S-126.

3       Q.      That's a code for CRS's system?

4       A.      Well, that's a code that

5    identifies an affidavit is being

6    requested.

7              So the firm would send an S-126

8    from their system to eRecoverEase and

9    eRecoverEase will send it to CRS.  At the

10   same time, that code gets put into a

11   system called MAPS.

12      Q.      What does MAPS stand for?

13      A.      I don't know, but it's just

14   M-A-P-S, goes into that, which is -- we

15   call it a system, it's essentially a

16   database, that identifies that an

17   affidavit was requested for that account.

18             And then it will -- it has a

19   process where it will pull data in from

20   CRS to populate the various fields in

21   MAPS, and those fields are what's

22   utilized to create that affidavit.

23      Q.      And what kind of fields are you

24   referring to?

25      A.      So consumer's name,

```
                                    Page 185
 1                   Bradley Luke
 2    co-borrower's name, if there is a
 3    co-borrower, the status of the account,
 4    balances, last payment date, amount, the
 5    Trust name, fields such as those.
 6        Q.    But the rest of the affidavit
 7    is a template that's been pre-created; is
 8    that right?
 9        A.    Yes.
10        Q.    And then there are -- pardon my
11    layman's terms -- blank spaces for these
12    fields that you just described?
13        A.    Essentially, they're merged
14    fields, um, so the data will be pulled in
15    to populate this -- I don't know, for
16    lack of a better word -- placeholder
17    within that text file or Word document.
18        Q.    And is that done automatically
19    or is there some sort of manual
20    involvement by somebody at TSI/NCO?
21        A.    So the process is kicked off by
22    a human to merge the documents.
23        Q.    By what human?
24        A.    Whoever is on the affidavit
25    production team working those batches at
```

1                        Bradley Luke

2    that day.

3        Q.    What is the affidavit

4    production team, because I don't think

5    we've gone into detail about that?

6        A.    They're just the team that

7    produces the affidavits for the affiant

8    to review.

9        Q.    And that's separate from the

10   affiant team?

11       A.    It is.

12       Q.    How many members did the

13   affidavit production team have between

14   late 2012 through 2016?

15           MR. SCHULTZ:   Object to the

16       form.

17       A.    Between three and seven maybe

18   at any point in time.

19       Q.    Who was the supervisor of the

20   affidavit production team during that

21   time frame?

22       A.    I don't recall who was the

23   supervisor other than the current

24   supervisor, um, and I don't recall the

25   supervisor between 2012, late 2012 to

```
                                      Page 187
 1                   Bradley Luke
 2    2016.
 3        Q.    So MAPS is used to transfer
 4    individual data points from the CRS to
 5    populate the placeholder spaces within
 6    the affidavit template?
 7        A.    It's one of the functions of
 8    MAPS, yes.
 9        Q.    Okay.
10              And every time that a request
11    is sent by a law firm and it goes through
12    eRecoveryEase, somebody from the
13    affidavit production team has to hit a
14    button?
15        A.    To actually print out that
16    affidavit, yes, unless they are batched
17    together.  I mean one button push could
18    print out 10 affidavits, or however many
19    affidavits are put together in a batch
20    when the process was kicked off.
21        Q.    How did they decide whether to
22    just hit the button for one or hit the
23    button for 10 or however many?
24              MR. SCHULTZ:  Object to form.
25        A.    Mostly it's a product of
```

Page 188

1                         Bradley Luke
2     resources.  So if we had two affiants in
3     and there's already, let's say, if there
4     are 10 affidavits already printed, then
5     it's judged upon the workload of you have
6     two people, 10 affidavits, we'll print
7     five more, that way they have enough
8     workload to sustain the day or the next
9     couple days.
10              So it's mostly a byproduct of
11    the resources and what's already out
12    there produced and printed.
13       Q.    Who keeps track of how many
14    affidavits have been printed and how many
15    should be printed at any given point in
16    time?
17       A.    The supervisor.
18       Q.    Supervisor of?
19       A.    The affidavit production team.
20       Q.    How did they keep track of how
21    many affidavits should be produced at any
22    given point in time?
23       A.    I'm not entirely certain.
24       Q.    When they print out a batch,
25    what printer did they use?

```
 1                   Bradley Luke
 2       A.    It's a big office printer, I
 3   think it's like a Riav?  If that's how to
 4   pronounce it?
 5       Q.    Ricoh?
 6       A.    That's -- sure.  I mean it's a
 7   big office printer/scanner.
 8       Q.    Okay.
 9             Where was that printer/scanner
10   located?
11       A.    Depending on what time period,
12   I mean currently it's in a room in our
13   office.  Um, back in the late 2012/2013 I
14   don't recall, um, where the printer was,
15   but it was in the office somewhere.
16       Q.    In whose office?
17       A.    Inside NCO/TSI's office.
18       Q.    In whose?
19       A.    NCO or TSI's.
20       Q.    Let me ask you this:  Where did
21   the affidavit production team sit in
22   relation to the affiant team?
23       A.    All within eyeshot, you could
24   all see each other.
25       Q.    Okay.
```

```
 1                    Bradley Luke
 2            All within that same big room
 3    that you were describing?
 4        A.    Yes.
 5        Q.    And then when a batch got
 6    printed out, how would they go from the
 7    affidavit production team?
 8              MR. HAWKINS:  Strike that.
 9        Q.    This Ricoh printer was located
10    closer to the affidavit production team
11    or to the affiant team?
12        A.    Pretty much equidistant.  I
13    mean they all sat pretty much in the same
14    area.  If it was closer to one than the
15    other it would be a matter of a couple of
16    steps at tops.
17        Q.    How did the affiant team know
18    that new affidavits had been printed out?
19        A.    So part of their daily, um,
20    process when they get into the office and
21    get situated, they would go to where the
22    batches are stored, it's a file cabinet,
23    they would open up the drawer and see
24    batches in there and they would sign out
25    a batch.
```

Page 191

1                      Bradley Luke

2       Q.      Let's pause for a second there.

3              How did the physical affidavits

4    go from the Ricoh printer to that file

5    drawer?

6       A.      The affidavit production team

7    that had printed them out, they would go

8    pick them up and then bind them together

9    as appropriate, via paper click per

10   affidavit, and then they would rubber

11   band them together with the batch cover

12   sheet.

13      Q.      What did the batch cover sheet

14   say?

15      A.      Basically it's a reconciliation

16   of what was in the batch, so they can --

17   the affiant can verify that that batch

18   was complete when they grabbed it.

19              So they would have various

20   surface level -- the request reference

21   number, the consumer's name on the

22   affidavit, and I think it included like a

23   balance on the affidavit.

24              And it would just have -- if it

25   was a batch of five, it would have five

Page 192

1                    Bradley Luke

2   rows with the different reference numbers

3   on it.

4       Q.    Okay.

5             Were copies of those batch

6   cover sheets saved?

7       A.    Yes, I believe so.

8       Q.    Okay.

9             To your knowledge, have those

10  batch cover sheets been produced as to

11  the subject affidavits as defined in the

12  Deposition Notice for today?

13      A.    I don't believe they have.

14      Q.    Okay.

15            MR. HAWKINS:  We are going to

16      call for production of those.

17      Q.    How would you go find those?

18      A.    By the age of the accounts or

19  the subject affidavits, I believe we

20  would have to go through and open up

21  individual pdfs to find the proper batch.

22            I could can be mistaken by

23  that, but based on the age, I believe

24  that would be the process by which we

25  would have to do it.

1                    Bradley Luke

2       Q.     What pdfs?

3       A.     The pdf of the scan, the scan

4    of the batch cover sheet.

5       Q.     So when they printed them out

6    they would scan a copy?

7       A.     After the affiant's completed

8    with the batch, the affiant basically

9    fills out that cover sheet saying when it

10   was signed, how many were signed, how

11   many were rejected, um, and it would

12   check off the ones that they signed, um,

13   and a notary would check off the ones

14   that they notarized.  Those are then

15   scanned in and maintained.

16      Q.     So I'm just confused about one

17   thing, is the batch cover sheet specific

18   to an individual account or to multiple

19   accounts for affidavits that are printed

20   out?

21      A.     The batch cover sheet is going

22   to contain information for whatever's in

23   that batch.  So if that batch contained

24   one affidavit, it would only have

25   information for one affidavit; but if

Page 194

1                    Bradley Luke

2    that a batch contained five affidavits,

3    all five would be referenced on that

4    sheet.

5         Q.    So an affiant, a member of the

6    affiant team would come in in the morning

7    during the time frame that we're talking

8    about, go to this file cabinet, open up

9    the drawer and there would be batches in

10   the drawer; correct?

11        A.    Presumably.

12        Q.    Did it have his or her

13   particular name on it or could they just

14   grab what they wanted?

15        A.    So they weren't designated by

16   affiant name, but there was an order in

17   which they were to grab them.  So they

18   were put in a drawer by oldest to newest.

19             Part of the process is that the

20   SCRA, the Servicemembers Civil Relief Act

21   form, could be no more than -- I believe

22   it was 30 days old, so to prevent any

23   affidavits from staying in the drawer 30

24   days and having to reproduce the scrub,

25   they were instructed to grab the oldest

```
                                  Page 229
 1                    Bradley Luke
 2       A.      Well, the reduction in daily
 3   output wasn't a byproduct or a conscious
 4   decision or mandate by TSI.  It was a
 5   byproduct of the affidavits including
 6   more information, documentation, taking
 7   longer to review, as well as there is a
 8   decrease in requests and need for
 9   affidavits.
10            So some days there wasn't 30
11   affidavits ready to be produced.
12       Q.    What kinds of additional
13   documents started to be included during
14   2016-2017 roughly?
15       A.     Documents started to be
16   included, the chain-of-time documents,
17   the schedule excerpts, all the way till
18   now, now financial information from AES,
19   loan financial activity, deferment for
20   variance for payment schedule are all
21   included in the affidavit.
22       Q.    Did the supervisors of the
23   affiant team ever meet with members of
24   the affiant team during the 2012-2016
25   time period about how many affidavits
```

Page 231

```
 1                    Bradley Luke
 2    CONTINUED EXAMINATION BY MR. HAWKINS:
 3        Q.    Mr. Luke, you understand that
 4    you're still under oath?
 5        A.    Yes, sir.
 6        Q.    Okay.
 7              I'd like to refer to Exhibit 8,
 8    comprising Bates 79 through 179.  We
 9    looked at the top of this exhibit earlier
10    and I'd like to call your attention to
11    document starting at Bates TSI 101.
12              MR. HAWKINS:  Strike that.
13        Q.    Starting at Bates 102.
14        A.    Okay.
15        Q.    Okay?
16        A.    I'll look at the TV screen; I'm
17    getting a spinning wheel but we can
18    proceed.
19        Q.    All right, sorry about that.
20              Do you recognize this document,
21    Mr. Luke?
22        A.    I do.
23        Q.    Okay.
24              What is this?
25        A.    This is a screen print of the
```

1              Bradley Luke
2    AES Compass system, this is a screen
3    print of the loan financial activity
4    screen; in particular, this is page 106
5    of that screen.
6        Q.   And these or this document --
7             MR. CASAMENTO:  Can you guys
8        unmute the phone?  I'm sorry.
9             MR. HAWKINS:  Oh, for the
10       record, I've unmuted the phone and
11       counsel can check the transcript for
12       what we said between when we went
13       back on the record and now.
14   CONTINUED EXAMINATION BY MR. HAWKINS:
15       Q.   This is a document that came
16   into TSI/NCO's possession from PHEAA;
17   correct?
18       A.   Essentially, TSI has a program
19   that logs into the system and takes
20   screenshots of the relevant loan,
21   particularly this screen, amongst other
22   screens.
23       Q.   Is this a document that
24   employees at TSI/NCO had access to
25   through Compass during the relevant time

1                    Bradley Luke

2   period?

3        A.    Yes.

4        Q.    And I'm referring to 2012

5   through 2016?

6        A.    Yes.

7        Q.    Okay.

8              Do you see where my mouse

9   pointer is pointed, "Tran type"?

10       A.    Yes.

11       Q.    Okay.

12             What does that refer to?

13       A.    Transaction type.  So that

14  column, um, of information is

15  alphanumeric codes which relate to

16  different transactions.

17       Q.    Okay.

18             Different transactions that --

19  that would have occurred at the time that

20  PHEAA was servicing an individual

21  account; is that right?

22       A.    Yes.  The transactions are

23  actually dated, um, if you look at the

24  effective date or posted date columns to

25  the left of transaction type, um, those

Page 234

                    Bradley Luke

1

2    are the dates that that transaction was

3    put onto the account.

4        Q.    Okay.

5              Do you know -- I'm not going to

6    go through each one of them -- but do you

7    know generally speaking what these

8    transaction types mean?

9        A.    Yes, sir.

10       Q.    How do you know that?

11       A.    Through my training with AES.

12       Q.    Okay.

13             Did members of the affiant team

14   have training to know what these

15   transaction types mean?

16       A.    Yes.

17       Q.    Okay.

18             Did they receive a dictionary,

19   for lack of a better word, of what these

20   various transaction types mean?

21       A.    They may have.  I can't recall

22   with certainty whether they were actually

23   given documents or were just trained on

24   what they meant and they took notes.  I

25   don't remember exactly.

Page 235

1                        Bradley Luke
2        Q.      Okay.
3                Do you or somebody else at TSI
4    have a -- some sort of comprehensive
5    dictionary that you could produce of what
6    individual transaction types mean as
7    they're reflected on this log and the
8    other logs that exist in the production
9    that you have made in this litigation?
10       A.      An existing dictionary, I'm not
11   sure whether that exists or not.  I'd
12   have to go back and double check.
13               It's been a while since I've
14   looked for something of that nature.
15       Q.      Okay.
16               Do you remember ever seeing
17   such a comprehensive list?
18       A.      I remember seeing a list, um,
19   but I don't know if it was a
20   comprehensive list or if that list was
21   just put together by an individual
22   employee to help them remember their
23   training.
24               I don't remember what the
25   source of that list was but I do recall

Page 236

```
 1              Bradley Luke
 2   seeing a list of at least some of the
 3   codes.
 4      Q.    Do you know how many
 5   transaction type codes PHEAA has?
 6      A.    I do not, but I can say
 7   generally working through these loans as
 8   part of my normal business, commonly
 9   there's about 10 different codes that are
10   on any loan.
11           MR. HAWKINS:  We're going to
12      call for production of those and --
13           MR. SCHULTZ:  The AES code
14      glossary.
15           MR. HAWKINS:  Glossary, that's
16      the word I was looking for.
17           MR. SCHULTZ:  And you're going
18      to ask that from TSI?
19           MR. HAWKINS:  Yes.
20           MR. SCHULTZ:  Please put that
21      in writing and we will respond to it
22      accordingly.
23           MR. HAWKINS:  Call, I used the
24      word "call."
25   CONTINUED EXAMINATION BY MR. HAWKINS:
```

```
                                    Page 241
 1                    Bradley Luke
 2   right?
 3        A.    Yes.
 4        Q.    All right and the loan activity
 5   would be the same thing for another pdf
 6   file?
 7        A.    Yes, the loan financial
 8   activity.
 9        Q.    When an account is assigned
10   to -- when an account was assigned to
11   TSI/NCO during the 2012-2016 period, what
12   was the first thing that TSI/NCO did with
13   respect to the account?
14              MR. SCHULTZ:   Object to the
15        form.
16        A.    First thing would be to import
17   the information, um, from PHEAA to create
18   the account record.
19        Q.    Did anybody at TSI/NCO ever do
20   collection efforts involving phone calls?
21        A.    Potentially, depends on the
22   account.
23        Q.    Depends on whether phone calls
24   had previously been made by another
25   entity with respect to that account?
```

Page 242

1                    Bradley Luke

2        A.     Not necessarily.  Um, we spoke

3    briefly about our agency network?

4        Q.     Yes.

5        A.     Various third-party agencies.

6        Q.     Yes.

7        A.     TSI operates within that agency

8    network also, um, so an account could be

9    placed from TSI the special subservicer

10   to TSI the collection agency for

11   collection attempts.

12       Q.     Phone-based collection

13   attempts?

14       A.     Phone and letter.

15       Q.     How did TSI/NCO go about

16   selecting an account for referral to an

17   outside law firm such as Forster and

18   Garbus for litigation-based collection

19   efforts?

20       A.     So generally the accounts would

21   go through two years of collection

22   attempts, phone calls, letters.  Those

23   two years are comprised of six-month

24   periods at different agencies; so if you

25   had agency one for six months, two,

Page 243

                    Bradley Luke

1
2  three, four, to make your two-year time

3  period.

4      Q.    Do you have a term of art that

5  you use to refer to those periods of

6  time?

7      A.    Yes.

8      Q.    What are they?

9      A.    The first six months is

10  primary; second, secondary; third,

11  tertiary; fourth is quad.

12      Q.    Primary what?

13      A.    We just refer to it as the

14  primary segment.

15      Q.    Segment?

16      A.    Yeah.

17      Q.    Is there another word that you

18  use besides segment?

19      A.    No, typically we just refer to

20  it shorthand as primes.

21      Q.    Okay.

22            So you would just say this has

23  been in primary, this has been in

24  secondary, this has been in tertiary and

25  so on?

Page 244

1                     Bradley Luke
2        A.     Yes.
3        Q.     And quad is litigation?
4        A.     No, quad is the fourth.
5        Q.     And what happens in quad?
6        A.     Same thing that happens in
7    primary, secondary and tertiary, it's
8    just the last six months of call and
9    collect attempts.
10       Q.     Okay.  Please continue.
11       A.     I apologize.
12              So once an account goes through
13   those four levels or two years of
14   collection attempts and no resolution has
15   been agreed upon, payment arrangement,
16   something, things of those -- or that
17   sort of thing, then it goes into a unit
18   for various scrubs to be conducted on the
19   account to determine whether it's
20   eligible to be placed to a law firm.
21       Q.     I'm going to pause you there
22   for a second.
23              You mentioned scrubs before in
24   reference to whether a consumer is a
25   serving member of the military; correct?

```
                                    Page 251
 1                  Bradley Luke
 2        Q.    You have referred to an
 3   attorney network or firm network, which
 4   is the term?
 5        A.    Attorney network.
 6        Q.    Attorney network.  And that is
 7   a network of outside firms that regularly
 8   conduct collection efforts, including
 9   litigation-based collection efforts on
10   behalf of National Collegiate Student
11   Loan Trusts; is that right?
12        A.    Yes.
13             MR. SCHULTZ:  Object to the
14        form.
15        Q.    How are firms selected to be
16   included in the network?
17             MR. SCHULTZ:  Object to the
18        form.
19             And to the extent it involves
20        any sort of attorney communications,
21        I instruct you not to answer.
22        A.    Firms have been part of the
23   network for quite a few years.  I don't
24   recall any new firms being added, um, so
25   I don't recall the specifics of what's
```

```
                                    Page 252
 1                 Bradley Luke
 2   reviewed to add a new firm because it
 3   hasn't happened in quite some time.
 4        Q.    So since late 2012, the same
 5   firms have been in the network -- between
 6   2000 --
 7             MR. HAWKINS:  Strike that.
 8        Q.    Between 2012 and 2016, the
 9   network was comprised of the same firms?
10        A.    I believe so.  I'd have to
11   double check to make sure no firms was
12   added like early 2013, but from my
13   recollection I believe the networks
14   hasn't added any firms in that time
15   period.
16        Q.    Has Forster & Garbus been a
17   member of the network from that whole
18   time?
19        A.    Yes.
20        Q.    Who went about selecting the
21   firms in the network?
22        A.    Going back from memory, it was
23   a group of individuals within back then
24   TS -- or NCO, um, but I don't -- I don't
25   know what groups those people were.  I
```

Page 258

1                    Bradley Luke

2    effective date of the market share

3    adjustment, would show them at 70

4    percent.

5                    So between the time Table 1

6    started and the date of Table 2, they had

7    50 percent; Table 2 going forward they

8    would have whatever percent I said, I

9    think I said 70.

10                   MR. SCHULTZ:  Seventy.

11                   MR. HAWKINS:  We are going to

12       call for production of that document

13       as pertaining to Forster & Garbus.

14   CONTINUED EXAMINATION BY MR. HAWKINS:

15       Q.    What would cause the market

16   share for a firm like Forster & Garbus to

17   be adjusted upwards?

18       A.    Could be any number of reasons;

19   they could be outperforming their

20   competitor.

21       Q.    Outperforming how?

22       A.    Through collections, their

23   revenue, they could have better

24   efficiency on recoveries of loans that

25   were placed to them.

```
                                      Page 259
 1                    Bradley Luke
 2        Q.     Including litigation-based
 3    recoveries?
 4        A.     Litigation-based recoveries
 5    would be looked at, um, but from my
 6    recollection, it's recoveries grouped
 7    together.
 8        Q.     What kinds of efficiencies
 9    would a law firm show that would make
10    them eligible for a market share
11    adjustment upwards?
12        A.     It would be basically time of
13    recovery.  So if the batch was placed to
14    them, what their liquidation rate over
15    the first 30 days, 60 days, 90 days.
16             If the firm really excels early
17    on in the batch placement, compared to a
18    firm that doesn't, that could impact the
19    market share.
20        Q.     You talked before about cost
21    discard, I believe that that's the term
22    that you used?
23        A.     Yes.
24        Q.     Explain what that term means.
25        A.     So when a firm expends a cost,
```

Page 260

                    Bradley Luke
1
2    they have to upload that cost to us,
3    letting you know that they expended it.
4    If they don't upload that cost to us
5    properly, our system won't process it
6    because it doesn't recognize it, so
7    that's the discard.
8              So to discard that cost, we
9    have a team that works with the firm to
10   remedy those discards so that they can
11   make sure that the costs get processed
12   properly.
13        Q.    So it's purely a coding error;
14   is that right?
15              MR. SCHULTZ:   Objection to
16        form.
17        A.    It could be a coding error or
18   an amount error.
19              We have caps for certain costs
20   based on states, um, where if, let's say,
21   cost code number one has a cap of $25.00
22   but the firm sends us $26.00 with that
23   cost code, it would be discarded.
24              It would be like, well, our cap
25   is 25, and they would have to evidence

1                    Bradley Luke
2   why it was actually 26, evidence that it
3   was proper instead of in error.
4        Q.    What kind of costs does a firm
5   incur that they have to then relate to
6   TSI/NCO?
7        A.    These are litigation-based
8   costs, so filing of a Complaint, service
9   of a Summons and Complaint, some states
10  have motion fees, they are all
11  litigation-based.
12       Q.    Are there special rules that a
13  firm like Forster & Garbus has to abide
14  by when a National Collegiate Student
15  Trust account is placed with it?
16            MR. SCHULTZ:  Objection to
17       form.
18       A.    There are.
19       Q.    And what are they?
20       A.    So the National Collegiate
21  Student Loan Trust portfolio, special
22  rules would be like statute of
23  limitations, um, recall process; there's
24  a process by which that they can keep an
25  account if they're working on a