## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MUTINTA MICHELO, KATHERINE SEAMAN,
MARY RE SEAMAN, AND SANDRA TABAR,
individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

NATIONAL COLLEGIATE STUDENT LOAN TRUST
2007-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-3; TRANSWORLD SYSTEMS, INC., in its
own right and as successor to NCO FINANCIAL
SYSTEMS, INC.; EGS FINANCIAL CARE INC.,
formerly known as NCO FINANCIAL SYSTEMS, INC.;
and FORSTER & GARBUS LLP,

      Defendants.

No. 18-cv-01781-PGG

----------------------------------------------------------------------

CHRISTINA BIFULCO, FRANCIS BUTRY, and CORI
FRAUENHOFER, individually and on behalf of all others
similarly situated,

      Plaintiffs,

v.

NATIONAL COLLEGIATE STUDENT LOAN TRUST
2004-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-4; TRANSWORLD SYSTEMS, INC., in its
own right and as successor to NCO FINANCIAL
SYSTEMS, INC.; EGS FINANCIAL CARE INC.,
formerly known as NCO FINANCIAL SYSTEMS, INC.;
and FORSTER & GARBUS LLP,

      Defendants.

No. 18-cv-07692-PGG

1

## DECLARATION IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Bradley Luke, declare under the laws of the State of Georgia and the United States of America under penalty of perjury:

1.      I am over the age of 18 and have personal knowledge of each of the matters set forth in this Declaration and, if called as a witness, would testify competently to them.

2.      I am a Director of Operations for Transworld Systems Inc. ("TSI"). I have been an employee of TSI since November 2014. From January 2010 until November 2014, I was employed by NCO Financial Systems, Inc. and worked on many of the same client portfolios as I do currently with TSI, including the Trusts described herein.

3.      I am duly authorized to make the representations contained in this Declaration for and on behalf of TSI.

4.      In my role as Director of Operations for TSI, I am knowledgeable and personally familiar with TSI's role and duties as Special Subservicer and a record keeper for loans subject to TSI administration for the four Trusts described below, the systems and processes TSI utilizes to maintain its business records, the training programs, standard operating procedures, and related materials TSI has established in the performance of its subservicing and record keeping duties, and I have reviewed the foregoing materials in preparation of giving this declaration. I also have access to and have reviewed the records and information TSI maintains regarding the plaintiffs and their student loans with the Trusts described below, and I have reviewed those materials in preparation of giving this Declaration.

5.      First Marblehead Corporation n/k/a Cognition Financial Corporation ("FMC") and its subsidiaries engaged in a series of student loan securitization transactions;

2

in those transactions, FMC arranged for national banks to sell certain student loans to various Delaware Statutory Trusts, either directly or through an intermediary. National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-2, and National Collegiate Student Loan Trust 2007-3 (collectively the "Trusts"), for which TSI serves as Special Subservicer, hold thousands of student loans that were purchased subsequent to the loan's origination, but prior to any default of a loan.

6.     For pre-default servicing activities on behalf of the Trusts, FMC entered into an agreement primarily with the Pennsylvania Higher Education Assistance Agency d/b/a American Education Services ("AES").

7.     Pursuant to a Default Prevention and Collection Services Agreement (hereinafter "Default Servicing Agreement"), as amended, TSI is a Special Subservicer and record keeper for the Trusts with respect to loans owned by those entities that are subject to TSI's administration.

8.     Specifically, TSI is Special Subservicer and a record keeper for the Trusts with respect to the loans forming the subject matter of the above captioned and numbered consolidated action, described, as follows (the "Loans"):

| Borrower | Cosigner | Loan Number/Sequence | Lender | Trust |
|---|---|---|---|---|
| Katherine Seaman | Mary Re Seaman | xxxxx8379/002-001000 | KeyBank, N.A. | 2007-3 |
| Jaelysabel Villasante | Sandra Tabar | xxxxx2466/002-001000 | National City Bank | 2007-2 |
| Philip Bifulco | Christina Bifulco | xxxxx5818/001-001000 | Bank One, N.A. | 2004-2 |
| Cori Frauenhofer | N/A | xxxxx1612/002-001000 | M&T Bank | 2006-4 |
| Francis Butry | Clara Butry | xxxxx4337/001-001000 | Bank One, N.A. | 2004-2 |

9.     The Education Resources Institute, Inc. ("TERI") processed the origination of each of the Loans on behalf of the Lender, ensured the Loans were disbursed, and

3

initially maintained the loan records and documents that were created during the origination and disbursement process (the "Origination Records"). The Origination Records include, among other things, Credit Agreement signature pages, Note Disclosure Statement pertaining to the Loans, and documents submitted by plaintiffs as part of the application process for the Loans.

10.     Following disbursement of the loan proceeds to the plaintiffs, TERI sent the Origination Records for the Loans to AES.

11.     AES serviced the Loans from their origination to their charge-off and kept contemporaneous records of its servicing activities, including records of payment, repayment schedules, loan deferments and loan forbearances, and similar information, in the regular course of its business.

12.     AES was also appointed a custodian of the original Credit Agreements and all other items in the student loan files within their charge,

13.     The Loans charged-off following non-payment and, accordingly, pursuant to the Default Servicing Agreement, TSI (or its predecessor(s), including my former employer, NCO) began performing its Special Subservicing and recordkeeping duties regarding the Loans, as follows:[1]

| Loan-Trust Pair | Charge-off | NCO Subservicing Date |
|---|---|---|
| Seaman/2007-3 | 2/1/12 | 11/2/12 |
| Tabar/2007-2 | 10/3/11 | 11/2/12 |
| Bifulco/2004-2 | 6/1/10 | 11/2/12 |
| Frauenhofer/2006-4 | 12/1/10 | 11/2/12 |
| Butry/2004-2 | 7/1/11 | 11/2/12 |

14.     TSI (or its predecessor and my former employer, NCO) received documents relating to the Loans, as follows:

---

[1] The charged-off accounts were initially serviced by First Marblehead Education Resources, Inc. ("FMER"), pursuant to the Special Servicing Agreement, at charge off and then NCO in November 2012.

**Pool Supplements**

        a.   On May 14, 2012, NCO received from FMC or its subsidiaries (collectively "First Marblehead") via a secure file share the Pool Supplements relating to Bifulco's Loan with NCSLT 2004-2 and Butry's Loan with NCSLT 2004-2.   On October 31, 2012, NCO received from First Marblehead via a secure file share the Pool Supplements relating to Seaman's Loan with NCSLT 2007-3 and Frauenhofer's Loan with NCSLT 2006-4.   In 2012, and at all relevant times hereto, NCO had access to the Pool Supplement relating to Tabar's Loan with NCSLT 2007-2.   As detailed below, the loan schedules to these Pool Supplements were received separately;

        b.   True and correct copies of the above-described Pool Supplements that NCO received and TSI maintains on file servers controlled by TSI are attached, *in globo*, as **Exhibit 1-A**;

**Loan Schedules**

        c.   On November 14, 2012, NCO received in a digital Excel file format from First Marblehead each of the loan schedules pertaining to the plaintiffs' Loans;

        d.   Upon receipt, the Excel files were initially stored on NCO file servers that are now controlled and maintained by TSI;

        e.   Since receipt, the Excel files have not been modified at any time;

        f.   The information regarding the plaintiffs' Loans has been excerpted from the digital Excel files constituting the schedules, re-formatted for ease of display, and printed on standard-sized printed paper for purposes of this declaration; those printed excerpts are limited to the plaintiffs' Loans in order to protect the privacy of third parties' personal or financial identifying information. The printed excerpts are exhibited hereto as

5

indicated below:

| Exhibit | Corresponding Digital File Name | Applicable Loans |
|---------|--------------------------------|------------------|
| 1-B | 20073_Lender Report – Post Sale-KEY BANK.xls | Seaman/2007-3 |
| 1-C | Lender Report - Post Sale-NATIONAL CITY BANK.xls | Tabar/2007-2 |
| 1-D | Bank One Final Roster.xls | Bifulco/2004-2 |
| 1-E | M&T_Bank.xls | Frauenhofer/2006-4 |
| 1-F | Bank One Final Roster.xls | Butry/2004-2 |

g.   Personal and financial information for each of Katherine and Mary Re Seaman, Tabar, Bifulco, Frauenhofer and Butry's Loans (*e.g.*, Social Security Numbers, loan disbursement amount, date of disbursement and other details), appear in the respective digital files and also in the printed excerpts exhibited to this Declaration. Based on my personal review of the digital files, there are no errors or disparities in the personal and financial information of each plaintiff's Loan;

**Deposit and Sale Agreements**

h.   On April 25, 2013, NCO received the Deposit and Sale Agreement relating to Butry's and Bifulco's loan with NCSLT 2004-2, on September 1, 2014, NCO obtained from the U.S. Securities and Exchange Commission the Deposit and Sale Agreements relating to the Seamans' loan with NCSLT 2007-3 and Frauenhofer's loan with NCSLT 2006-4, and on November 1, 2014, TSI obtained from the U.S. Securities and Exchange Commission the Deposit and Sale Agreements relating to Tabar's loan with NCSLT 2007-2;

i.   True and correct copies of the above-described Deposit and Sale Agreements that NCO or TSI received and TSI maintains on file servers controlled by TSI are attached, *in globo*, as **Exhibit 1-G**;

**Account Level Loan Documents**

j.   NCO received the Credit Agreement signature pages and Note

6

Disclosure Statement relating to the Bifulco's loan with NCSLT 2004-2 from AES on or before October 24, 2013;

k. NCO received the Credit Agreement signature pages and Note Disclosure Statements relating to Seamans loan with NCSLT 2007-3, Tabar's loan with NCSLT 2007-2, Frauenhofer's loan with NCSLT 2006-4, and Butry's loan with NCSLT 2004-2 from First Marblehead on or about November 13, 2012, in connection with NCO's transition to Special Subservicer that occurred in November 2012;[2]

l. NCO saved and indexed the Credit Agreement signature pages and Note Disclosure Statements to NCO's record of plaintiffs' accounts on or near the date the documents were transferred to NCO;

m. True and correct copies of the above-described Credit Agreement signature pages and Note Disclosure Statements that NCO received and TSI maintains on file servers controlled by TSI are attached, *in globo*, as **Exhibits 1-H** and **1-I**, respectively;

n. NCO received the terms for all of the Loans from First Marblehead when NCO began servicing the loans in November 2012. True and correct copies of the above-described applicable terms that NCO received and TSI maintains on file servers controlled by TSI are attached, *in globo*, as **Exhibit 1-J**;

15. TSI has maintained possession and control of the documents described in ¶ 14, above, continuously and without interruption or alteration since each document was first received.

---

[2] NCO's receipt of documents and information from AES is consistent with § 2.3 of the "Default Servicing Agreement, as amended, which I have reviewed; it provides:

> <u>Default Collection Services</u>. [U.S. Bank] shall cause the Servicers [*e.g.*, AES and FMER] to provide to NCO all documents and information specified in the Servicing Agreements and/or Servicing Guidelines.

**Servicing Records**

16.     TSI also maintains a record of its Special Subservicing activities, including records of payments, interest charges, and other financial transactions impacting defaulted student loans owned by the Trusts.  TSI, or NCO and FMER before it, has maintained such a record for each of the Loans since TSI, and NCO/FMER before it, first began servicing the Loans.

17.     TSI and NCO/FMER before it, at all times relevant had real-time access to records of activities, including records of loan disbursement, sale and securitization, payment, repayment schedules, loan deferments and loan forbearances, recorded by the pre-default servicer of the Loans, AES.  TSI had and continues to have real-time access to such records directly from AES.

18.     TSI or NCO before it obtained the foregoing records from AES pursuant to § 2.3 of the Default Servicing Agreement[3]

19.     Based on my review of AES's pre-default records that have been provided by AES or through TSI's contractual access to AES's records and comparing them with the loan schedules in TSI's custody and control as described above, there are no errors or disparities between those source materials regarding the plaintiffs' Loan information.

20.     TSI (and formerly NCO) has access to AES's systems of record Compass, its employees are trained in AES's system of record, and TSI (and formerly NCO) employees are familiar with AES's record keeping codes.  AES provides notice to borrowers and cosigners, including plaintiffs here, of delinquency prior to transfer of the account to TSI (and formerly NCO or FMER) and offers opportunities for curing

---

[3] *See* fn. 3.

delinquency of the Loans. TSI (and formerly NCO) maintains its own dedicated system of record Collection Resource System ("CRS") for electronic transactions pertaining to plaintiffs' education loans, including, but not necessarily limited to, payments, credits, interest accrual and any other transactions that could impact plaintiffs' education loans. *Id.* Each TSI (and formerly NCO) employee at all relevant times hereto was provided a unique username and password to access CRS and Compass.

21.     NCO eventually placed the Loans with Forster & Garbus, LLP ("F&G") for collection; according to TSI's records based, in part, on information reported to NCO by F&G, F&G or its individual attorneys commenced separate collection lawsuits in New York courts on behalf of each of the Trusts, as follows:

| Loan-Trust Pair | Suit Number | County | Commencement |
|---|---|---|---|
| Seaman/2007-3 | 15713-14/QU | Queens | May 14, 2014 |
| Tabar/2007-2 | 761-14/BX | Bronx | January 14, 2014 |
| Bifulco/2004-2 | 2399-13/BU | Buffalo City | April 12, 2013 |
| Frauenhofer/2006-4 | 4454-13/BU | Buffalo City | June 19, 2013 |
| Butry/2004-2 | 264-13/TO | Towanda City | November 15, 2013 |

22.     NCO (and TSI for the Cummins affidavit) thereafter provided to F&G, at F&G or its individual attorneys' request, signed and notarized affidavits pertaining to each loan, as follows:

| Loan-Trust Pair | Suit Number | Affiant | Date of Affidavit |
|---|---|---|---|
| Seaman/2007-3 | 15713-14/QU | James Cummins | May 20, 2015 |
| Tabar/2007-2 | 761-14/BX | Dudley Turner | February 18, 2014 |
| Bifulco/2004-2 | 2399-13/BU | Colleen Morgan | May 7, 2013 |
| Frauenhofer/2006-4 | 4454-13/BU | Chandra Alphabet | October 7, 2013 |
| Butry/2004-2 | 264-13/TO | Jonathan Boyd | September 3, 2014 |

23.     NCO (and later TSI) established and maintains training programs and standard operating procedures to educate and train its employees, including Turner, Morgan, Alphabet, Boyd, and Cummins, regarding the Trusts' loans and loan documentation, and required processes, including NCO's (and TSI's) processes for

reviewing loan information and documents related to affidavits. A redacted excerpt of the NCT Affidavit Verification Signing and Notarizing Procedure along with amendments by TSI is attached as **Exhibit 1-K.**

24.     At the time Turner, Morgan, Alphabet, Boyd, and Cummins signed their affidavits, NCO's (and later TSI's) policy and practice required Turner, Morgan, Alphabet, Boyd, and Cummins be trained on relevant standard operating procedures and successfully complete relevant training regimens before verifying any facts in an affidavit for any of the Trusts.

25.     Additionally, each of the affiants were required to execute the affidavits under penalty of perjury in the presence of an attorney and notary. True and correct copies of the affidavits are attached, *in globo*, as **Exhibit 1-L.** Each affiant was at all relevant times required to execute a checklist linked to a particular affidavit, and also execute the batch cover sheet along with the notary. The affiant was also required to contemporaneously document in the CRS system whether the particular affidavit was approved or rejected. True and correct screen shots of the CRS screen shots are attached hereto as **Exhibit 1-M**. After execution, the applicable affidavit, and supporting exhibits, was sent via FedEx and a Secure Web Mailbox to F&G.

26.     TSI agreed to enter into a consent order with the CFPB on September 15, 2017. A true and correct copy of the Consent Order is attached hereto as **Exhibit 1-N**. In the Consent Order, TSI did not admit to any findings of fact, conclusions of law, or any violation of the law. The Consent Order does not preclude TSI from servicing the Trust portfolio retroactively or prospectively, and does not preclude the Trusts, TSI, or law firms from collecting or suing on loans subject to compliance with its terms. Based upon TSI's

records, none of the plaintiffs' accounts were entitled to any of the benefits provided for by the Consent Order.

## Loan Specific Information

### Katherine Seaman and Mary Re Seaman

27.     On July 6, 2007, Katherine V. Seaman, as borrower, and Mary A. Re Seaman, as cosigner, executed a "Loan Request/Credit Agreement" for Katherine Seaman to attend CUNY – Queensborough Community College for academic period September 2007 to December 2007.  A true and correct copy of the Credit Agreement and related terms and conditions are attached as **Exhibit 1-O.**

28.     The loan was originated by KeyBank N.A. and disbursed to the Seamans on July 17, 2007 in the amount of $12,686.00.  A true and correct copy of the Note Disclosure Statement and Disbursement Check is attached as **Exhibit 1-P.**

29.     On September 20, 2007, prior to the default, and prior to any payments even being due, and pursuant to a Pool Supplement and Deposit and Sale Agreement, the loan was assigned from KeyBank N.A. to NCF to NCSLT 2007-3.  A true and correct copy of the Pool Supplement and Deposit and Sale Agreement along with a redacted excerpt of the schedule is attached as **Exhibit 1-Q.**

30.     AES sent Katherine Seaman and Mary Re Seaman letters between 2008 and 2012 identifying that the account was owned by "National Collegiate Trust".  A true and correct copy of the AES letters are attached as **Exhibit 1-R.**

31.     On April 4, 2014, the account was placed by NCO with F&G.

32.     On May 29, 2014, F&G filed a lawsuit against the Seamans styled *National Collegiate Student Loan Trust 2007-3 v. Seaman*, Index No. 15713-14/QU, in the Queens

County Civil Court. The suit alleged that the Seamans were in default of a promissory note; it asserted causes of action for breach of contract and account stated, and sought $24,324.29. A true and correct copy of the complaint is attached as **Exhibit 1-S.**

33.    The Seamans were served on June 24, 2014, but did not appear and defend this action and on March 30, 2015, F&G filed an application for default judgment, which was granted. That application included the affidavit of TSI employee James H. Cummins ("Cummins"). A true and correct copy of the affidavit of service and affidavit is attached as **Exhibit 1-T.**

34.    On March 31, 2015, a default judgment was entered in the amount of $24,609.29. On April 15, 2015, the judgment was enforced via income execution on Mary Re Seaman; however, her wages were not garnished related to this debt and no payments have been made.

35.    The account was properly and accurately credit reported by AES at or near to the origination of the account until charge-off, and then by NCO from May 11, 2014 through the date a tradeline removal request was made on July 20, 2014. The tradeline reflected a debt owed to National Collegiate Trust. The account has not been credit reported since then.

36.    The Seamans currently owe NCSLT 2007-3 $38,484.24.

**<u>Christina Bifulco</u>**

37.    On September 6, 2004, Philip J. Bifulco, as borrower, and Christina Bifulco, as cosigner, executed a "Loan Request/Credit Agreement" for Philip J. Bifulco to attend Canisius College for academic period August 2004 to May 2005. A true and correct copy of the Credit Agreement and related terms and conditions are attached as **Exhibit 1-U.**

12

38.     The loan was originated by Bank One, N.A. and disbursed to Philip J. Bifulco and Christina Bifulco on September 14, 2004 in the amount of $8,000.00. A true and correct copy of the Note Disclosure Statement and Disbursement Check is attached as **Exhibit 1-V.**

39.     On October 28, 2004, prior to the default, and prior to any payments even being due, and pursuant to a Pool Supplement and Deposit and Sale Agreement, the loan was assigned from Bank One, N.A. to NCF to NCSLT 2004-2. A true and correct copy of the Pool Supplement and Deposit and Sale Agreement along with a redacted excerpt of the schedule is attached as **Exhibit 1-W.**

40.     On or about March 19, 2007, Philip J. Bifulco and Christina Bifulco entered into a forbearance agreement for the loan. A true and correct copy of the forbearance agreement is attached as **Exhibit 1-X.**

41.     AES sent the Bifulco's multiple letters confirming they were in default and identifying that the account was owned by "National Collegiate Trust". A true and correct copy of the AES letters are attached as **Exhibit 1-Y.**

42.     On March 6, 2013, the account was placed by NCO with F&G.

43.     On April 12, 2013, F&G filed a lawsuit styled *National Collegiate Student Loan Trust 2004-2 v. Bifulco, et al.*, No. 2399-13/BU, in the Buffalo City Court. The suit alleged that the Bifulco's were in default on a promissory note; it asserted causes of action for breach of contract and account stated, and sought $12,541.44. A true and correct copy of the complaint is attached as **Exhibit 1-Z.**

44.     Christina Bifulco was served on May 18, 2013, but did not appear and defend this action and on March 24, 2014, F&G filed an application for a default judgment.

That application included the affidavit of NCO employee Colleen Y. Morgan. A true and correct copy of the affidavit of service and affidavit is attached as **Exhibit 1-AA.**

45.     On March 25, 2014, the Buffalo City Court Clerk granted a default judgment against Bifulco in the amount of $12,864.94. On September 15, 2015, the Erie County Clerk recorded a lien in connection with the Bifulco judgment, and the Bifulco judgment was enforced via income execution on Bifulco and her wages were garnished from December 2015 to January 2021.

46.     The account has been properly and accurately credit reported by AES at or near to the origination of the account until charge-off, and then by NCO, then TSI, from July 28, 2013 through the date a tradeline removal request was made on February 8, 2015. The tradeline reflected a debt owed to National Collegiate Trust. The account has not been credit reported since then.

### Francis Butry

47.     On August 27, 2004, and August 26, 2004, respectively, Francis A. Butry, as borrower, and Clara Butry, as cosigner, executed a "Loan Request/Credit Agreement" for Francis A. Butry to attend Niagara University for academic period August 2004 to December 2004. A true and correct copy of the Credit Agreement and related terms and conditions are attached as **Exhibit 1-BB.**

48.     The loan was originated by Bank One, N.A. and disbursed to Francis A. Butry and Clara Butry on September 27, 2004, in the amount of $5,000.00. A true and correct copy of the Note Disclosure Statement and Disbursement Check is attached as **Exhibit 1-CC.**

49.     On October 28, 2004, prior to the default, and prior to any payments even

14

being due, and pursuant to a Pool Supplement and Deposit and Sale Agreement, the loan was assigned from Bank One, N.A. to NCF to NCSLT 2004-2.  A true and correct copy of the Pool Supplement and Deposit and Sale Agreement along with a redacted excerpt of the schedule is attached as **Exhibit 1-DD.**

50.     Between 2009 and 2010, AES mailed letters to Butry stating that the Butry Loan was owned by "National Collegiate Trust".  A true and correct copy of the AES letters is attached as **Exhibit 1-EE.**

51.     On June 5, 2013, the account was placed by NCO with F&G.

52.     On November 15, 2013, F&G filed a lawsuit styled *National Collegiate Student Loan Trust 2004-2 v. Butry*, No. 264-13/TO in the Towanda City Court. The suit alleged that Butry was in default of a promissory note; it asserted causes of action for breach of contract and account stated, and sought $8,419.32.  A true and correct copy of the complaint is attached as **Exhibit 1-FF.**

53.     Butry was served on December 9, 2013, but did not appear and defend this action.   A true and correct copy of the affidavit of service is attached as **Exhibit 1-GG.**

54.     Butry made five payments of $50 to F&G in 2014.

55.     On September 18, 2014, F&G filed an application for a default judgment. That application included the affidavit of NCO employee Jonathan Boyd.  A true and correct copy of the affidavit is attached as **Exhibit 1-HH.**

56.     On September 18, 2014, the Towanda City Court Clerk granted a default judgment against Butry in the amount of $8,406.82. On October 21, 2014, the Erie County Clerk recorded a lien in connection with the Butry judgment and two total payments were made in November and December 2018.

15

57.     The account has been properly and accurately credit reported by AES at or near to the origination of the account until charge-off, and then by NCO from July 7, 2013 through the date a tradeline removal request was made on August 11, 2013. The tradeline reflected a debt owed to National Collegiate Trust. The account has not been credit reported since then.

58.     Butry currently owes NCSLT 2004-2 $13,389.03.

**Cori Frauenhofer**

59.     On June 19, 2006, Cori A. Frauenhofer executed a "Loan Request/Credit Agreement" to attend Niagara University for academic period August 2006 to December 2006. A true and correct copy of the Credit Agreement and related terms and conditions are attached as **Exhibit 1-II.**

60.     The loan was originated by M&T Bank and disbursed to Niagara University and Cori A. Frauenhofer on October 20, 2006 in the amount of $5,435.00. A true and correct copy of the Note Disclosure Statement is attached as **Exhibit 1-JJ.**

61.     On December 7, 2006, prior to the default, and prior to any payments even being due, and pursuant to a Pool Supplement and Deposit and Sale Agreement, the loan was assigned from M&T Bank to NCF to NCSLT 2006-4. A true and correct copy of the Pool Supplement and Deposit and Sale Agreement along with a redacted excerpt of the schedule is attached as **Exhibit 1-KK.**

62.     Between 2008 and 2010, AES sent Frauenhofer multiple letters confirming she was in default and identifying that the account was owned by "National Collegiate Trust". A true and correct copy of the AES letters are attached as **Exhibit 1-LL.**

63.     On or about September 18, 2007 and September 22, 2010, Frauenhofer

submitted forbearance requests to AES related to the loan. A true and correct copy of the forbearance requests are attached as **Exhibit 1-MM.**

64.      On or about August 26, 2008, and July 12, 2009, Frauenhofer submitted deferment requests to AES related to the loan. A true and correct copy of the deferment requests are attached as **Exhibit 1-NN.**

65.      On May 8, 2013, the account was placed by NCO with F&G.

66.      On June 19, 2013, F&G filed a lawsuit styled *National Collegiate Student Loan Trust 2006-4 v. Frauenhofer*, No. 4454-13/BU, in the Buffalo City Court. The suit alleged that Frauenhofer was in default on a promissory note; it asserted causes of action for breach of contract and account stated, and sought $7,242.12. A true and correct copy of the complaint is attached as **Exhibit 1-OO.**

67.      Frauenhofer was served on July 1, 2013, but did not appear and defend this action, and on December 6, 2013, F&G filed an application for a default judgment. A true and correct copy of the affidavit of service is attached as **Exhibit 1-PP.**

68.      F&G sent Frauenhofer letters prior to filing suit on behalf of NCSLT 2006-4, and after the lawsuit was filed Frauenhofer spoke with F&G representatives about a hardship program related to the loan and repayment to NCSLT 2006-4.

69.      The default judgment application included the affidavit of NCO employee Chandra Alphabet. A true and correct copy of the affidavit is attached as **Exhibit 1-QQ.**

70.      On December 10, 2013, the Buffalo City Court Clerk granted a default judgment against Frauenhofer in the amount of $7,565.62.

71.      On February 11, 2014, the Erie County Clerk recorded a lien in connection with the Frauenhofer judgment.

72.     The account has been properly and accurately credit reported by AES at or near to the origination of the account until charge-off, and then by NCO, then TSI, from June 16, 2013 through the date a tradeline removal request was made on February 8, 2015. The tradeline reflected a debt owed to National Collegiate Trust.  The account has not been credit reported since then.

73.     Frauenhofer currently owes NCSLT 2006-4 $12,430.18.

**Sandra Tabar**

74.     On January 20, 2007, Jaelysabel Villasante, as borrower, and Sandra Y. Tabar, as cosigner, executed a "Loan Request/Credit Agreement" for Villasante to attend Cazenovia College for academic period January 2007 to January 2008.   A true and correct copy of the Credit Agreement and related terms and conditions are attached as **Exhibit 1-RR.**

75.     Documents were provided by Tabar to apply for the loan, including her pay stubs.  A true and correct copy of the pay stubs submitted is attached as **Exhibit 1-SS.**

76.     The loan was originated by National City Bank and disbursed to Villasante and Tabar on February 15, 2007 in the amount of $15,000.00.  A true and correct copy of the Note Disclosure Statement and Disbursement Check is attached as **Exhibit 1-TT**

77.     On June 14, 2007, prior to the default, and prior to any payments even being due, and pursuant to a Pool Supplement and Deposit and Sale Agreement, the loan was assigned from National City Bank to NCF to NCSLT 2007-2.  A true and correct copy of the Pool Supplement and Deposit and Sale Agreement along with a redacted excerpt of the schedule is attached as **Exhibit 1-UU.**

78.     AES sent Tabar and Villasante multiple letters to their residence in 2010

and 2011 confirming they were in default and identifying that the account was owned by "National Collegiate Trust". A true and correct copy of the letters is attached as **Exhibit 1-VV.**

79.     On December 6, 2013, the account was placed by NCO with F&G.

80.     F&G sent Tabar and Villasante multiple letters to their residence in 2013 and 2014 confirming they were in default.

81.     On January 14, 2014, F&G filed a lawsuit styled *National Collegiate Student Loan Trust 2007-2 v. Villasante*, No. 761-14/BX, in the Bronx County Civil Court. The suit named Sandra Tabar as a co-defendant. The suit alleged that Tabar was in default on a promissory note agreement and asserted causes of action for breach of contract and account stated, and sought $11,782.40. A true and correct copy of the complaint is attached as **Exhibit 1-WW.**

82.     An affidavit of service, indicating service on Tabar through delivery of the summons and complaint to Tabar's co-tenant, and service via mail, was submitted in connection with the lawsuit by F&G. A true and correct copy of the affidavit of service is attached as **Exhibit 1-XX.**

83.     Tabar did not appear and defend this action and on April 3, 2014, F&G filed an application for a default judgment. That application included the affidavit of NCO employee Dudley Turner. A true and correct copy of the affidavit is attached as **Exhibit 1-YY.**

84.     F&G sent Tabar and Villasante multiple letters confirming the filing of the lawsuit and the entry of the judgment.

85.     On March 27, 2014, the Bronx County Civil Court issued a default

judgment against Tabar in the amount of $12,062.40. NCSLT 2007-2 never sought to enforce the judgment in any way, and no payments were made.

86.     Tabar was not garnished related to the 2007-2 loan.

87.     The account has been properly and accurately credit reported by AES at or near to the origination of the account until charge-off, and then by NCO, then TSI, from January 5, 2014 through the date a tradeline removal request was made on February 8, 2015.  The tradeline reflected a debt owed to National Collegiate Trust.  The account has not been credit reported since then.

All of the foregoing statements are true and correct to the best of my knowledge, information and belief.

Executed this 11th day of August, 2021.

BRADLEY LUKE