UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KATHERINE SEAMAN, MARY RE SEAMAN, and SANDRA TABAR, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) ) | |
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP, | ) ) ) ) ) ) ) ) ) ) | No. 18-cv-1781 |
| Defendants. | ) ) | |
| CHRISTINA BIFULCO, FRANCIS BUTRY, and CORI FRAUENHOFER, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) ) | |
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP, | ) ) ) ) ) ) ) ) ) ) | No. 18-cv-7692 |
| | ) | **FILED VIA ECF** |
| Defendants. | ) ) ) | |

---

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO
## DEFENDANTS' RULE 12(b)(1) MOTION

## TABLE OF CONTENTS

I. LEGAL STANDARDS ................................................................................... 1

II. BACKGROUND ...................................................................................... 2

    A. Defendants Already Admitted *TransUnion* Confirms Standing Here ........................... 2

    B. Defendants' Motion Admits *TransUnion* Confirms Standing For Key Claims .............. 3

III. ARGUMENT ......................................................................................... 3

    A. Defendants Cannot Find A Single FDCPA Case Denying Plaintiffs' Standing ......... 3

    B. *TransUnion* And Subsequent Decisions Confirm Each Plaintiff's Standing ................ 5

    C. No Claim Should Be Dismissed Absent Leave To Amend The Pleading .................. 14

IV. CONCLUSION ....................................................................................... 14

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Age Kola v. Forster & Garbus LLP*,
   No. 19-cv-10496, 2021 U.S. Dist. LEXIS 172197 (S.D.N.Y. Sep. 10, 2021) .......................... 4

*Bartell v. Nat'l Collegiate Student Loan Trust 2005-3*,
   No. 14-cv-04238, 2015 U.S. Dist. LEXIS 54921 (N.D. Cal. Apr. 27, 2015)........................... 9

*Bock v. Pressler & Pressler, LLP*,
   254 F. Supp. 3d 724 (D.N.J. 2017) ......................................................................................... 6

*Ciccone v. Cavalry Portfolio Servs., LLC*,
   No. 21-cv-2428, 2021 U.S. Dist. LEXIS 228037 (E.D.N.Y. Nov. 29, 2021) ........................... 4

*Ewing v. Med-1 Sols., LLC*,
   Nos. 21-1276 & -1299, 2022 U.S. App. LEXIS 3020 (7th Cir. Feb. 2, 2022) ................... 11, 12

*Faehner v. Webcollex, LLC*,
   No. 21-1734-cv, 2022 U.S. App. LEXIS 4439 (2d Cir. Feb. 18, 2022) ................................... 14

*Fernandez v. Rentgrow, Inc.*,
   No. 19-cv-1190, 2022 U.S. Dist. LEXIS 58378 (D. Md. Mar. 9, 2022) ................................. 12

*In re FDCPA Mailing Vendor Cases*,
   No. 21-cv-2312, 2021 U.S. Dist. LEXIS 139848 (E.D.N.Y. July 23, 2021)............................. 4

*In re Nat'l Prescription Opiate Litig.*,
   No. MDL 2804, 2022 U.S. Dist. LEXIS 40221 (N.D. Ohio Mar. 7, 2022) .............................. 6

*Makhnevich v. Bougopoulos*,
   No. 18-cv-285, 2022 U.S. Dist. LEXIS 57706 (E.D.N.Y. Mar. 29, 2022).......................... 5, 10

*Marquez v. Weinstein, Pinson & Riley, P.S.*,
   836 F.3d 808 (7th Cir. 2016) .................................................................................................... 9

*McKinley v. Everest Receivable Servs.*,
   No. 19-cv-1289S, 2022 U.S. Dist. LEXIS 26236 (W.D.N.Y. Feb. 14, 2022)........................... 6

*McRobie v. Palisades Acquisition XVI, LLC*,
   No. 15-cv-18, 2022 U.S. Dist. LEXIS 38778 (W.D.N.Y. Mar. 3, 2022) ....................... 6, 9, 10

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   No. 19-56514, 2022 U.S. App. LEXIS 9455 (9th Cir. Apr. 8, 2022)....................................... 13

*Panebianco v. Selip & Stylianou, LLP*,
    No. 21-cv-5466, 2022 U.S. Dist. LEXIS 23308 (E.D.N.Y. Feb. 9, 2022) ............................ 5, 8

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ..................................................................................................... 9

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)................................................................................................... passim

*Westerman v. Constar Fin. Servs., LLC*,
    No. 21-cv-2255, 2021 U.S. Dist. LEXIS 192803 (D. Md. Oct. 4, 2021) .................................. 6

*Winslow v. Forster & Garbus, LLP*,
    No. 15-cv-2996, 2017 U.S. Dist. LEXIS 205113 (E.D.N.Y. Dec. 13, 2017)............................ 9

*Zlotnick v. Equifax Info. Servs., LLC*,
    No. 21-CV-7089, 2022 U.S. Dist. LEXIS 21146 (E.D.N.Y. Feb. 3, 2022) ...................... 11, 12

**Constitutional Provisions**

U.S. Const. art. III, § 2 ..................................................................................................... passim

**Statutes**

Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. .................................................................. 1

Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. .............................................. passim

N.Y. Jud. Law § 487 .................................................................................................... 5, 8, 9, 10

New York General Business Law § 349............................................................................... passim

**Rules**

Fed. R. Civ. P. 12(b)(1)............................................................................................................ 1

**Other Authorities**

Consumer Fin. Prot. Bureau,
    *Consumer Credit Reports: A Study of Medical and Non-medical Collections*
    (Dec. 2014) ................................................................................................................... 12, 13

Plaintiffs respectfully submit this brief in opposition to Defendants' motion to dismiss a portion of Plaintiffs' claims pursuant to Rule 12(b)(1) (the "Motion").[1] Defendants' brief asks this Court to make new law, without offering a compelling reason to do so. The case upon which their brief relies, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ("*TransUnion*"), involved none of the claims brought before this court.

Since *Transunion* was decided, no court has interpreted *TransUnion* to deny Article III standing to Plaintiffs who allege they suffered fraudulent conduct in court. Plaintiffs suffered concrete harms when Defendants defrauded Plaintiffs, and state courts, by fraudulently prosecuting them in state court over unprovable debts using false affidavits. In many instances, fraudulently obtained judgments were used to initiate garnishments.

In the context of the FDCPA,[2] Defendants rely on so-called "letter cases," whereby the only harm alleged is from receipt of a debt collection-initiating letter. Those cases do not involve any of the serious allegations here, including fraudulent conduct before state and local courts, as part of an illegal scheme. To the contrary, here Defendants' fraudulent conduct in state and local courts caused plaintiffs concrete harms. Lastly, Defendants should be estopped from arguing that Plaintiffs do not have standing as they admitted that they do have standing in an earlier brief.

This Court should deny Defendants' Motion.

## I.   <u>LEGAL STANDARDS</u>

*TransUnion* does not hold that consumers lack Article III standing where they were exposed to debt-collection violations in connection with state-court actions, like those Defendants

---

[1] *See* Dkt. Nos. 371–372 in Case No. 18-cv-1781; Dkt. Nos. 300–301 in Case No. 18-cv-7692. Page references of "Mot. at __" are to the second document, which is Defendants' brief. References to "Mot. App'x at __" are to the Appendix A annexed to the brief.

[2] Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. The statutory scheme at issue in *TransUnion* was the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.

pursued against Plaintiffs here.  Instead, T*ransUnion* confirms the standing of plaintiffs alleging that their Article III injury was caused by the defendant's disseminating unverified negative information about consumers to third parties.  Standing was confirmed because incorrect information about the plaintiffs was actually disseminated by the defendant to third parties, and was only denied for one group of absent class members as to whom no dissemination occurred. *TransUnion*, 141 S. Ct. at 2200, 2209.

Notably, *TransUnion* did <u>not</u> require the plaintiffs to provide evidence of harm in order to confirm their Article III standing.  Instead, *TransUnion* treated those consumers' harm as akin to that in a common-law case for defamation per se, where harm to reputation is presumed and damages may be awarded without more specific proof of harm.  *Id.* at 2208–09.  Accordingly, *TransUnion* holds that consumers like Plaintiffs enjoy standing once negative information about them is disseminated without basis, and have no obligation to do more.

## II.   <u>BACKGROUND</u>

### A.  <u>Defendants Already Admitted *TransUnion* Confirms Standing Here</u>

Defendants admitted late last year that all Class members actually sued in state court—i.e., all Named Plaintiffs—have standing under *TransUnion*, meanwhile arguing that a limited subclass, those sued but not served, lack standing.  (Defs.' Mem. Opp. re Pls.' Mot. Class Cert., at 10 n.15 (Aug. 12, 2021) (Dkt. No. 323 in Case No. 18-cv-1781; Dkt. No. 251 in Case. No. 18-cv-7692)).

Moreover, Defendants passed up two other occasions late last year when they had a perfect opportunity to raise a standing challenge citing *TransUnion*, but chose not to: (1) when asking the Court's permission to file Rule 56 motions; (2) when moving under Rule 12 in the third related action here (*Butry et al. v. Trust 2005-3 et al.*, No. 20-cv-5843).

**B.  Defendants' Motion Admits *TransUnion* Confirms Standing For Key Claims**

Buried in a final footnote at the bottom of their Motion, Defendants admit their Motion is actually a limited one for partial relief.  (Mot. App'x at 1 n.1 (citing Am. Compl. ¶¶ 274(a)–(b), 280(a)–(b)).  Specifically, Defendants acknowledge that the Motion, even if granted, cannot dismiss the following claims under the FDCPA and New York General Business Law § 349 ("GBL"):

- Filing lawsuits against Plaintiffs and the other members of the Class without the intent or ability to prove the claims, if contested—which comprises the entire Class here.

- Filing lawsuits against Plaintiffs and the other members of the Class for the sole purpose of procuring default judgments against consumers and/or extracting settlements from them—again, the entire Class.

Contradictorily, Defendants do challenge standing for claims like those against Defendants' practice of obtaining default judgment by filing affidavits that falsely attested to possession and review of proof of debt.  (*See generally* Mot. App'x).  These inconsistencies make it impossible to understand Defendants' train of logic, or how they believe their Motion will advance the litigation, even if granted.  In any event, none of the Motion's arguments has merit.

**III.   ARGUMENT**

**A.  Defendants Cannot Find A Single FDCPA Case Denying Plaintiffs' Standing**

Defendants do not cite a single case in which plaintiffs suing under the FDCPA or similar state law were denied standing where the violations occurred in connection with collections that were the subject of suit in state court.  (Mot. at 5).  The limited portion of *TransUnion* which denied standing to one sub-class is logically irrelevant to FDCPA cases like Plaintiffs', because once a collection escalates to the level of suit filed, it inherently involves, at minimum: (1) dissemination of damaging statements—to state court clerks, to credit reporting bureaus, and to

anyone who gathers and receives information from these sources; and (2) the real threat of financial loss at any time, i.e., garnishment.

This scenario is nothing like the absence-of-harm finding for the one subclass in *TransUnion*, a result which reflects that case's unusual facts. *See* 141 S. Ct. at 2212. That finding was premised on the defendant's stipulation that it never disseminated terrorist labels about that subclass of consumersm and would not seek to profit from this information in future.[3]

Finding no cases on point, Defendants inaptly rely on post-*TransUnion* letter cases, in which FDCPA plaintiffs <u>who never got sued</u> were denied standing. In those letter cases, plaintiffs alleged debt collectors "disseminated" false statements by using a private mailing vendor to generate the initial collection letters sent to the plaintiffs. (Mot. at 5 (listing cases)). The courts there relied on the fact that mailing vendors do not share consumer information provided to them by customers that are debt collectors.[4]

---

[3]   Importantly, the terrorist labels at issue in *TransUnion* were not automatically included in consumers' credit reports, because this information was part of a special add-on feature that the defendant's business customers had to pay extra for. *See* 141 S. Ct. at 2200. Here, it's undisputed that the negative information about Plaintiffs that Defendants created was always disseminated. Their false and deceptive state-court papers were disseminated to court personnel; papers for any resulting garnishment were disseminated to employers (or possible ones); and the negative remarks about Plaintiffs that Defendants provided to the credit bureaus always were included in tradelines that automatically appear in credit reports.

[4]   *See In re FDCPA Mailing Vendor Cases*, No. 21-cv-2312, 2021 U.S. Dist. LEXIS 139848, at *14–18 (E.D.N.Y. July 23, 2021) (Brown, J.) ("[S]uch information is shared only with a mailing vendor."); *Ciccone v. Cavalry Portfolio Servs., LLC*, No. 21-cv-2428, 2021 U.S. Dist. LEXIS 228037, at *14 (E.D.N.Y. Nov. 29, 2021) (Seybert, J.) ("[S]pecific provisions of the FDCPA condone the use of intermediaries to communicate with debtors."). Similarly inapposite is Defendants' reliance on *Age Kola v. Forster & Garbus LLP*, No. 19-cv-10496, 2021 U.S. Dist. LEXIS 172197 (S.D.N.Y. Sep. 10, 2021) (Seibel, J.). The court there found no tangible or intangible injury where the plaintiff received initial collection letters indicating different balances on the debt account, but no information was disseminated publicly. *Id.* at *18–21.

### B. *TransUnion* And Subsequent Decisions Confirm Each Plaintiff's Standing

#### 1. Filing Collection Actions Without Reviewing Proof Causes Article III Injury

Defendants are incorrect that *TransUnion* and its progeny deny Article III standing to consumers defrauded by debt collectors' filing lawsuits supported by court papers in which an attorney or affiant falsely represents possession and review of proof of the debt alleged.  (Mot. at 6; *see* Mot. App'x at 1–2 (citing Am. Compl. ¶¶ 274(f) & (g) (FDCPA); 280(f) & (g) (GBL); 284(a), (d), & (e)(§ 487))).[5]

Courts have rejected this argument.  Because these "Plaintiff[s'] claims concern Defendants' alleged misconduct during the [state c]ourt action, Plaintiff[s'] claims share 'a close relationship [with] harms traditionally recognized as providing a basis for lawsuits in American courts.'"  *Makhnevich v. Bougopoulos*, No. 18-cv-285, 2022 U.S. Dist. LEXIS 57706, at *16 n.7 (E.D.N.Y. Mar. 29, 2022) (Matsumoto, J.) (quoting *TransUnion*, 141 S. Ct. at 2204).  Such harms traditionally recognized include the intangible harms addressed by common-law torts like wrongful use of civil proceedings.  *Makhnevich*, 2022 U.S. Dist. LEXIS 57706, at *16 n.7*; see Panebianco v. Selip & Stylianou, LLP*, No. 21-cv-5466, 2022 U.S. Dist. LEXIS 23308, at *3–4 (E.D.N.Y. Feb. 9, 2022) (Hurley, J.) (citing *TransUnion*) (Article III standing for FDCPA/GBL plaintiff who claimed "reputational harm" when debt collector sued him without ensuring service of complaint was sufficiently discreet).

The harms of reputational damage and being subjected to wrongful state-court actions are cognizable, even if the collector's claims of indebtedness may have merit: the collector causes Article III injury by simply by publicizing the fact of suit.  *Panebianco*, 2022 U.S. Dist. LEXIS 23308, at *3–4.  But the injury is even greater when the claims of indebtedness were pursued in

---

[5]  References to § 487 are to that provision of the New York Judiciary Law.

state court without review of proof, as were Defendants' here.  *McRobie v. Palisades Acquisition XVI, LLC*, No. 15-cv-18, 2022 U.S. Dist. LEXIS 38778, at *40 (W.D.N.Y. Mar. 3, 2022) (Roemer, Mag. J.) (confirming Article III injury where defendants filed state-court action against plaintiff without reviewing chain of title, yet "still maintain they have a right to collect a debt from" him).[6]

None of the above concepts is new.  The Article III injury resulting from no-review collections suits was actionable before *TransUnion* and remains so today.  *See id.*; *see also Bock v. Pressler & Pressler, LLP*, 254 F. Supp. 3d 724, 727, 736 (D.N.J. 2017) (Article III injury where collection attorney approved state-court complaint based on a few seconds' review of case file) ("Here, the deceptive implication that an attorney was meaningfully involved in the preparation of the collection complaint against [plaintiff] violated [his] substantive right [under the FDCPA] and created a particularized and concrete injury.")

Plaintiffs here have already detailed for the Court the outrageous consequences of Defendants' failure to check the proof of debt alleged exists and review it.  Defendants lacked the documents that would confirm (1) the dollar amount alleged, and (2) chain of title showing any debt really belonged to the Trust that Defendants presumed it did.  (Pls.' Mem. in Supp. Mot. Class Cert., at 5 (Dkt. No. 314 in Case No. 18-cv-1781; Dkt. No. 242 in Case. No. 18-cv-7692).  Defendants' attorneys and affiants were trained to disregard this evidentiary hole, and simply sign the boilerplate state-court papers that their superiors gave them in which they swore to possession

---

[6]  *See also McKinley v. Everest Receivable Servs.*, No. 19-cv-1289S, 2022 U.S. Dist. LEXIS 26236, at *18 (W.D.N.Y. Feb. 14, 2022) (Skretny, J.) ("Plaintiffs have standing from suffering injurious exposure to the debt collection attempt." (quotation omitted)); *Westerman v. Constar Fin. Servs., LLC*, No. 21-cv-2255, 2021 U.S. Dist. LEXIS 192803, at *4 (D. Md. Oct. 4, 2021) (Standing where defendant collected against consumer when it knew he was represented by an attorney); *cf. In re Nat'l Prescription Opiate Litig.*, No. MDL 2804, 2022 U.S. Dist. LEXIS 40221, at *106, 158–160 (N.D. Ohio Mar. 7, 2022) (Article III standing for consumers where pharmacies' "incentive policy rewarding speed [in fulfilling prescriptions] was pernicious as applied to the dispensing of opioids, because it put patients at risk.").

and review of proof.  (*Id.*; *see also* Pls.' Class Cert. Mot., 1st Hawkins Decl.[7] ¶¶ 22–24 & Exs. B & L).

If they had checked, they would've noticed problems with the dollar amount and chain of title.  For example, as to dollar amount, Defendants asserted the debt included a loan-origination fee that was inflated beyond the fee percentage listed in Defendants' records.  At deposition here, Defendants' senior personnel couldn't explain the inflation.  (Pls.' Class Cert. Reply, 2d Hawkins Decl.,[8] ¶ 22 & Ex. G).  As to chain of title, Defendants lack the documentation to prove a specific Trust was assigned a specific loan.  The incomplete and unauthenticated documents that they claim show chain of title are internally inconsistent.  No one checked any of this, because it was more profitable to sue consumers without asking questions.  (Pls.' Class Cert. Reply, 2d Hawkins Decl.,[9] ¶¶ 6–24).  In the vast majority of actions, the consumer didn't fight back, leaving the state court with only Defendants' false statements.  But when they did fight back, Defendants would drop the action before trial, rather than risk their scheme's exposure.  (*Id.* & ¶¶ 25–34).

No Plaintiff is required to prove these violations caused them harm, as Defendants' dissemination of false statements of indebtedness against Plaintiffs constituted per se harm to reputation.  *TransUnion*, 141 S. Ct. at 2208-09.  But even if the law did impose such a heavy evidentiary burden, sufficient proof abounds here.  By Defendants' own evidence, both during and after suit Plaintiffs were harassed with letters demanding payment, using suit and/or judgment as a threat.  (Decl. ¶ 4[10] & Exs. 3-A–3-G).  They suffered wage garnishment, as well as the indignity of Defendants' sending garnishment notices to possible employers in search of money.  (Decl. ¶ 3

---

[7]  Dkt. No. 315 in Case No. 18-cv-1781; Dkt. No. 243 in Case. No. 18-cv-7692.

[8]  (Dkt. No. 336 in Case No. 18-cv-1781; Dkt. No. 264 in Case No. 18-cv-7692

[9]  (Dkt. No. 336 in Case No. 18-cv-1781; Dkt. No. 264 in Case No. 18-cv-7692

[10]  References to "Decl. ¶ ___" are to the Declaration of Asher Hawkins in support of this opposition.

& Exs. 2-A–2-D).  They felt upset, angry, humiliated, and afraid about being targeted over debt claims they didn't think were right but felt powerless to contest at the time; and also about the financial damage they had or might suffer.  (Decl. ¶ 2 & Ex. 1-A at 302:8–303:6 (testimony by Plaintiff K. Seaman); Ex. 1-B at 192:6–193:23 (Re Seaman); Ex. 1-D at 133:1–138:16 (Bifulco); Ex. 1-E at 154:4–22 (Butry); Ex. 1-F at 120:11–25 (Frauenhofer)).  Lastly, for those who fought back,[11] there was time and money wasted on trips to state court, making copies of court papers, serving papers by mail, and so on.  (Decl. ¶ 2 & Ex. C (Tabar)).  Courts interpreting *TransUnion* have confirmed Article III standing for far less significant harms.  *Panebianco*, 2022 U.S. Dist. LEXIS 23308, at *3–4 (indiscreet service of state-court collection complaint).

### 2. False Statements In State-Court Papers Cause Article III Injury

Defendants are also wrong that *TransUnion* condones Defendants' practice of including false statements in their state-court papers, because (Defendants say) there somehow cannot be any "'downstream consequences'" of their falsities.  (Mot. at 7 (quoting 141 S. Ct. at 2214); *see* Mot. App'x at 1–2 (citing Am. Compl. ¶¶ 274(c), (d), & (e) (FDCPA); 280(c), (d), & (e) (GBL); 284(b) & (c) (§ 487))).  This argument suffers a fatal logical flaw: Defendants wouldn't have included the falsities in their court papers if these didn't help Defendants' collection suit.

Defendants relied on three falsities:  (1) Each Trust is an "original creditor," when really it was an assignee.  (2) Each Trust must be paid the debt alleged, despite not first identifying which

---

[11] One Plaintiff here (Ms. Tabar) appeared in state court after learning of the federal investigation, and, after much time, effort, and expense, succeeded in having the default judgment vacated; the suit was dismissed with prejudice after she demanded proof and a trial.  Defendants don't dispute lost time and money such as she suffered satisfies *TransUnion*'s Article III standard.  *See* Mot. 5–9; *see generally* Ord. of Oct. 11, 2019, 419 F. Supp. 3d 668, 714 n.29 (Emphasizing that "damage in the form of—among other things—the costs of litigating the state debt collection proceeding" are "well established [as] constitute[ing] damages for [statutory] purposes," which carry a higher burden than the low one for Article III standing).

lender may have originated the underlying loan.  (3) Each Trust is "authorized to proceed" in state court, when really none is, for failure to register with the state.[12]  Defendants' "use[ of] abusive and misleading debt collection practices that [a]re prohibited under the FDCPA and New York law" inherently cause Article III injury, as such violations allow Defendants to manufacture entitlement to judgment despite having "no legal right" to collect anything from Plaintiffs. *McRobie*, 2022 U.S. Dist. LEXIS 38778, at *39 (Article III standing where defendant falsely represented chain of title in state-court action).

No court before or after *TransUnion* has condoned practices like Defendants'.  *Id.* (relying on *TransUnion*); *see Winslow v. Forster & Garbus, LLP*, No. 15-cv-2996, 2017 U.S. Dist. LEXIS 205113, at *26–35 (E.D.N.Y. Dec. 13, 2017) (Shields, Mag. J.) (certifying FDCPA and GBL class against same Defendants' use of "original creditor" and "[Trust] is authorized" falsities in state-court papers); *see also Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 813–14 (7th Cir. 2016) (confirming FDCPA claims against collector for misquoting text of FDCPA in state-court complaint); *Bartell v. Nat'l Collegiate Student Loan Trust 2005-3*, No. 14-cv-04238, 2015 U.S. Dist. LEXIS 54921, at *16–17 (N.D. Cal. Apr. 27, 2015) (upholding FDCPA claims against Trust defendant and TSI for failure to identify loan originator in state-court action).[13]

---

[12]   Plaintiffs' Appendix A hereto is a table describing live claims for which each Plaintiff has standing, with references to statute as well as their controlling pleading.

[13]   Further, Defendants' focus on each falsity individually ignores the aggregate impact.  (Mot. at 6–7).  Even if any of these falsities were acceptable on its own—which none is—this wouldn't excuse the illegality of using them in combination.  Debt-collection schemes like Defendants' enjoy a kind of positive feedback loop: more falsities about entitlement to judgment, in more suits, mean more judgments, and more money, continuing and growing the cycle.  Such schemes can be nearly as harmful to local court systems as to consumers alone.  *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 84–87 (2d Cir. 2015) (confirming class claims under FDCPA, GBL, and § 487 where defendants made multiple misrepresentations in each of thousands of state-court actions).

Defendants irrelevantly and incorrectly argue that Plaintiffs don't today recall how this campaign of falsities affected Plaintiffs at the time of the state-court actions. (Mot. at 6–7). The argument is irrelevant, because Defendants' falsities furthered the actions that caused Plaintiffs the various harms clearly demonstrated by the evidence here (including Plaintiffs' testimony). *See* Part III.B.1, *supra*; *see also McRobie*, 2022 U.S. Dist. LEXIS 38778, at *39. Next, Defendants are incorrect that Plaintiffs fail to articulate the adverse effects they experienced when presented with a stack of court papers falsifying their indebtedness to a Trust. As one Plaintiff put it, "What could I [do]? What could I?" (Pl. Bifulco Dep. Tr., 105–106 (emphasis added) (cited by Mot. at 7 & n.7)). These unsophisticated consumers didn't have the time or money to get help deciphering Defendants' deliberately confusing documents (if they saw even all these).[14] State-court personnel also were confused by Defendants' carefully tailored falsities, which additionally harmed Plaintiffs by subjecting them to unjustifiable civil prosecution. All of these harms are cognizable under Article III and *TransUnion*. *Makhnevich*, 2022 U.S. Dist. LEXIS 57706, at *16 n.7.[15]

### 3. False Statements To Credit Bureaus Cause Article III Injury

Finally, Defendants are wrong that *TransUnion* forecloses Plaintiffs' asserting credit-related harms, because—Defendants illogically assert—the bureaus wouldn't have disseminated the negative information Defendants provided to the bureaus. (Mot. at 8–9; *see* Mot. App'x at 1–2 (citing Am. Compl. ¶¶ 274(f) & (g) (FDCPA); 280(f) & (g) (GBL); 284(a), (d), & (e)(§ 487))).

---

[14] *See also* Pls.' Mem. in Supp. Mot. Class Cert., at 2–7. Defendants' papers' façade of validity had the desired effect on Plaintiffs, as it would any consumer: persuade them there's no point in fighting back. (*Id.*; *see* Pls.' Reply in Supp. Mot. Class Cert., at 6–7 n.8, & 9–10 (Dkt. No. 335 in Case No. 18-cv-1781; Dkt. No. 263 in Case. No. 18-cv-7692)).

[15] The presence of the falsities in Defendants' state-court papers also buttresses Plaintiffs' claims for failure to review. When Defendants' attorneys and professional witnesses stated that, for example, a Trust was an "original creditor," they either were intentionally making a false statement, or were so unfamiliar with the Trusts' structure that they believed this falsity true. Either violation causes Article III injury. *See* Part III.B.1, *supra*.

As an initial matter, Defendants' focus on what the bureaus did with the negative information is inapposite, because Defendants' liability attached the moment Defendants disseminated the information to a third party.

As the Seventh Circuit just emphasized, an FDCPA plaintiff has Article III standing under *TransUnion* to sue a debt collector for credit-reporting dubious information to the bureaus:

> The Consumers have shown publication here through their evidence of third-party dissemination.  In this regard, they resemble the prevailing subclass in *TransUnion*, who demonstrated that misleading information about them had been "disseminated to third parties" . . . .  *Id.* at 2209.  The Court in *TransUnion* did not require those plaintiffs to come forward with additional evidence of publication because dissemination was clear.  *See id.* at 2209.  Here too the Debt Collectors disseminated false reports about the Consumers to TransUnion.  To require more of the Consumers would permit the dicta in footnote six to erode *TransUnion*'s holding that evidence of dissemination to a third party is sufficient to show publication. . . .  [B]eing portrayed as a deadbeat who does not pay her debts has real-world consequences.

> *Ewing v. Med-1 Sols., LLC*, Nos. 21-1276 & -1299, 2022 U.S. App. LEXIS 3020, at *13–15 (7th Cir. Feb. 2, 2022) (emphasis added).

Moreover, the record contradicts Defendants' nonsense assertion that the bureaus wouldn't disseminate to other third parties the negative information about Plaintiffs that Defendants provided to the bureaus.  In their Rule 23 opposition, Defendants admitted not only that they credit-reported against all Plaintiffs, but also that Defendants later confirmed with the bureaus that the resulting "tradelines" were included in credit reports on Plaintiffs that the bureaus disseminated during the Class period.  (Defs.' Opp. re Pls.' Mot. Class Cert., Luke Decl. ¶¶ 35, 46, 57, 72, 87 (Dkt. No. 325 in Case No. 18-cv-1781)).[16]

---

[16]  These admissions render inapposite Defendants' reliance on *Zlotnick v. Equifax Info. Servs., LLC*, No. 21-CV-7089, 2022 U.S. Dist. LEXIS 21146, at *2–6 (E.D.N.Y. Feb. 3, 2022) (Brown, J.) (cited by Mot. at 5).  The record in that case, unlike here, contained no evidence the negative information was included in tradelines disseminated to third parties.  *Id.*  As in *TransUnion*, the lack of harm in *Zlotnick* reflects the case's unusual facts: the furnishers, card companies, inadvertently reported plaintiff's accounts as "charged off" when really he'd closed them.  *Id.*  The

Courts interpreting *TransUnion* reject Defendants' theory of failure-to-disseminate, because it makes no sense from a logical or economic perspective. Companies whose "business model is based on" trafficking negative information about consumers invariably do so whenever possible, and no reasonable factfinder could presume otherwise. *See Fernandez v. Rentgrow, Inc.*, No. 19-cv-1190, 2022 U.S. Dist. LEXIS 58378, at *13 n.9 (D. Md. Mar. 9, 2022).[17] Further, this Court would "foreclose an entire category of routinely pursued lawsuits" by adopting Defendants' "proposed reading of *TransUnion*," wherein "each putative class member [must] show" both dissemination of, and third-party reliance onm Defendants' negative information. *Id.* at *16–17.

Post-*TransUnion* decisions instead recognize that "being portrayed as a deadbeat [always] has real-world consequences." *Ewing*, 2022 U.S. App. LEXIS 3020, at *15. A mountain of governmental and academic study establishes that any negative tradeline, like the ones Defendants caused against each Plaintiff, is inherently harmful, in the manner of defamation per se. As one government study found, each negative tradeline "is incorporated as a derogatory factor in most credit scoring models, which use credit report information to predict a consumer's likelihood of repaying debts." Consumer Fin. Prot. Bureau, *Consumer Credit Reports: A Study of Medical and Non-medical Collections*, at 9 (Dec. 2014). Notably, the key scoring model utilized by the Fair Isaac Corporation ("FICO") treats the addition of a collections tradeline of at least $100 such that it reduces a score of 680 by over 40 points, and a score of 780 by over 100 points. *Id.* A negative

---

reports were technically wrong but there was no debt collection, which is what the bureaus strive to include in tradelines (as here). *Id.*

[17] Indeed, the record here refutes Defendants' suggestion that only some Plaintiffs and Class members here were the subject of negative credit-reporting by Defendants to third parties. Beyond Bradley Luke's declaration, Defendants' internal records confirm they negatively reported in connection with every single collection action they prosecuted. (Pls.' Mem. in Supp. Mot. Class Cert., at 24). It would be "[un]reasonable for a jury to conclude that" Defendants' negative information about Plaintiffs, once disseminated, was never seen nor relied upon. *Fernandez*, 2022 U.S. Dist. LEXIS 58378, at *16 n.11

tradeline acts like a garnishment, depriving the consumer of access to funds until the collector is paid and notifies the bureaus.  "[The] significant drop in a credit score [caused by a negative tradeline of at least $100] will generally increase a consumer's cost of borrowing credit," if not worse.  *Id.*[18]

Lastly, even if Plaintiffs weren't able to show past Article III injury in the form of damage to creditworthiness reputation, they still would have standing to seek equitable relief to address the ongoing threat posed thereto.  Plaintiffs demand that Defendants be enjoined to contact the bureaus and FICO to ensure Plaintiffs' credit scores are recalculated such that the impact of Defendants' wrongful reporting is negated.  *See* Pls.' Mem. in Supp. Mot. Class Cert., at 23–24; *see also TransUnion*, 141 S. Ct. at 2210 (emphasizing that "a person exposed to a risk of future harm [has standing to] pursue forward-looking, injunctive relief . . . .").

In addition, while Mr. Luke indicated that Defendants requested tradeline removals in certain instances,[19] there's no confirmation Defendants have done so for the Class as a whole. Each Plaintiff named has standing to enjoin Defendants to ensure all negative tradelines against Class members are rescinded, aside from the injunction necessary to repairing their credit scores. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, No. 19-56514, 2022 U.S. App. LEXIS 9455, at *56 n.32 (9th Cir. Apr. 8, 2022) ("[T]he Supreme Court has long recognized

---

[18]  To the extent the Court requires further detail about how reduction in credit score might translate into quantifiable pecuniary loss for members of the Class, the appropriate procedure is to direct class-damages discovery following certification.  (Pls.' Mem. in Supp. Mot. Class Cert., at 24 n. 15).  Again, *TransUnion* doesn't require that proof of an intangible harm be submitted, let alone quantified, to establish Article III standing—the dissemination of unfounded negative information is harmful, per se.  *See* 141 S. Ct. at 2208-09.

[19]  Mr. Luke didn't say what prompted these removals, nor is there any indication in his declaration that Defendants told the bureaus these removals should reflect unjustified negative-reporting. (Defs.' Opp. re Pls.' Mot. Class Cert., Luke Decl. ¶¶ 35, 46, 57, 72, 87).

that in cases seeking injunctive or declaratory relief, only one plaintiff need demonstrate standing to satisfy Article III.").

### C. <u>No Claim Should Be Dismissed Absent Leave To Amend The Pleading</u>

If this Court is inclined to dismiss any of Plaintiffs' claims after reviewing Defendants' Motion, the Motion still should not be granted.   Rather, the appropriate next step would be to permit Plaintiffs an opportunity for repleading, as well as supplementation of the previously ordered Class-sampling discovery, to incorporate Defendants' interactions with the bureaus about Class members' tradelines.   *See Faehner v. Webcollex, LLC*, No. 21-1734-cv, 2022 U.S. App. LEXIS 4439, at *1–2 (2d Cir. Feb. 18, 2022) (allowing plaintiff to amend complaint where *TransUnion*'s impact on standing was unclear)

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, this Court deny Defendants' Motion.   If, in the alternative, the Court perceives any merit in the motion, the Court should grant Plaintiffs opportunity to replead and supplement the record.

Dated:      New York, New York
            April 22, 2022

                                    Respectfully submitted,

                                    **FRANK LLP**

                                    By:    _/s/ Gregory A. Frank_____
                                    Gregory A. Frank (GF0531)
                                    Marvin L. Frank (MF1436)
                                    Asher Hawkins (AH2333)
                                    305 Broadway, Suite 700
                                    New York, New York 10007
                                    Tel: (212) 682-1853
                                    Fax: (212) 682-1892
                                    gfrank@frankllp.com
                                    mfrank@frankllp.com
                                    ahawkins@frankllp.com

                                    *Counsel for Plaintiffs and the Classes*

## PLAINTIFFS' APPENDIX A

This table lists Plaintiffs' claims.  Check marks mean live claims for which Plaintiffs have standing.

| | K. Seaman | Re Seaman | Bifulco | Butry | Frau'r | Tabar |
|---|---|---|---|---|---|---|
| ***Bad Faith Prosecution*** [1] | | | | | | |
| FDCPA (¶ 274(a)-(b)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| GBL 349 (¶ 280(a)-(b)) | | ✔ | ✔ | | ✔ | ✔ |
| **False Affidavits** | | | | | | |
| FDCPA (¶ 274(g)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| GBL 349 (¶ 280(g)) | | ✔ | ✔ | | ✔ | ✔ |
| NYJL 487 (¶ 284(e)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| **Lack of Review/ Meaningful Att'y Involvement** | | | | | | |
| FDCPA (¶ 274(f)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| GBL 349 (¶ 280(f)) | | ✔ | ✔ | | ✔ | ✔ |
| NYJL 487 (¶ 280(a)&(d)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| **False Credit Reporting** | | | | | | |
| FDCPA (¶ 274(h)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| GBL 349 (¶ 280(h)) | ✔ | ✔ | ✔ | | ✔ | ✔ |
| **"Original Creditor" Falsity** | | | | | | |
| FDCPA (¶ 274(d)) | | | NA [2] | NA | NA | ✔ |
| GBL 349 (¶ 280(d)) | | ✔ | NA | NA | NA | ✔ |
| NYJL 487 (¶ 284(b)) | ✔ | ✔ | NA | NA | NA | ✔ |

---

[1]  Defendants' Motion admits Plaintiffs' standing for these claims.  (*See* Mot. App'x at 1 n.1).

[2]  "NA" means not alleged.

| | K. Seaman | Re Seaman | Bifulco | Butry | Frau'r | Tabar |
|---|---|---|---|---|---|---|
| **"Trust is Authorized" Falsity** | | | | | | |
| FDCPA (¶ 274(c)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| GBL 349 (¶ 280(c)) | | ✔ | ✔ | | ✔ | ✔ |
| NYJL 487 (¶ 284(c)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| **Failure to Identify Originator** | | | | | | |
| FDCPA (¶ 274(e)) | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| GBL 349 (¶ 280(e)) | | ✔ | ✔ | | ✔ | ✔ |